705 A.2d 798

JEM MARKETING, LLC, PLAINTIFF–APPELLANT, v. CELLULAR TELECOMMUNICATIONS INDUSTRY ASSOCIATION; MOTO-ROLA CORPORATION; AND PROFESSIONAL SECURITIES BUREAU LTD., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted January 22, 1998—Decided February 5, 1998.

Before Judges BAIME, WEFING and BRAITHWAITE.

*Sherman, Silverstein, Kohl, Rose & Podolsky,* attorneys for appellant (*Alan C. Milstein* and *Harris L. Pogust,* on the brief).

*Archer & Greiner,* attorneys for respondent Cellular Telecommunications Industry Association (*George F. Kugler, Jr.* and *Nicholas C. Harbist,* on the joint brief).

*McCarter & English,* attorneys for respondent Motorola Corporation (*William J. O'Shaughnessy,* on the joint brief).

*Frank N. Yurasko,* attorney for respondent Professional Securities Bureau Ltd. (*Mr. Yurasko,* on the joint brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

Plaintiff JEM Marketing, LLC brought this action against defendants Cellular Telecommunications Industry Association, Motorola Corporation, and Professional Securities Bureau Ltd. alleging violations of the New Jersey Antitrust Act (*N.J.S.A.* 56:9–1 to –19), racketeering under the New Jersey Racketeering statute (RICO Act) (*N.J.S.A.* 2C:41–1 to –6.2), conspiracy, tortious interference with economic advantage, malicious prosecution, and libel and slander. The principal thrust of plaintiff's claim was that defendants conspired to make false accusations to the United States Secret Service in an effort to drive the company to ruin.

According to the complaint, defendants informed the Secret Service that plaintiff was engaged in the illegal business of altering cellular telephones to defraud cellular carriers of their activation and monthly service fees. Plaintiff alleged that these false accusations culminated in the issuance of a search warrant and the confiscation of the company's equipment, supplies and documents, resulting in the destruction of its business. The Law Division dismissed plaintiff's complaint. Plaintiff appeals. We affirm.

We hold that the practice of "cloning" cellular telephones violates federal law. We also conclude that because plaintiff operated an illegal enterprise, it did not have a legitimate business interest subject to protection under New Jersey's tort laws. Plaintiff's claims for antitrust violations, racketeering, tortious interference with economic advantage and conspiracy were properly dismissed on that basis. We are further satisfied that the Law Division correctly dismissed plaintiff's remaining claims.

## I.

Plaintiff is a New Jersey Limited Liability Company engaged in the business of providing cellular extension telephone products. According to plaintiff, an "extension telephone" is a cellular unit that carries the same telephone number and electronic serial number as the principal telephone. Plaintiff's business involved copying factory-set serial numbers from a customer's cellular telephone and reprogramming another cellular telephone with the same serial number. Plaintiff utilized what is known as a "moto box" or "copycat box," a device that transfers the telephone number and serial number to the "extension" telephone. The end-result of this process is the creation of two telephones, the original and a "clone," that carry the same telephone number and serial number. All telephone calls made from the extension telephone are billed by the cellular provider as if made from the original factory-set telephone purchased by the consumer. As we understand it, the cellular carrier is deprived of its activation and monthly service fees on the cloned telephone. Apart from its

business of reprogramming cellular telephones, plaintiff manufactured and/or sold moto boxes to the public.

Plaintiff actively marketed its services in a number of national publications. Having become aware of plaintiff's business, Motorola, a manufacturer of cellular telephones, Cellular Telecommunications Industry Association, an organization representing manufacturers and producers of cellular products, and Professional Securities Bureau Ltd., a private investigative agency, commenced an investigation. According to plaintiff's complaint, defendants "began disseminating [false] information to the ... Secret Service." More specifically, defendants allegedly told the Secret Service that (1) moto boxes have no legitimate purpose, (2) such devices can be used to bypass a carrier's tracking and billing processes, and (3) plaintiff was accepting "stolen" telephones in exchange for copycat boxes.

Based upon the information supplied by defendants and his independent investigation, Special Agent Thomas Tamburello of the Secret Service applied for a warrant to search plaintiff's business premises. The affidavit upon which the search warrant ultimately issued was submitted to the Law Division by plaintiff in opposition to defendants' motion to dismiss the complaint, and is thus part of the record. In the affidavit, Special Agent Tamburello recited much of the information that had been supplied by defendants. With one critical deviation, the complaint accurately described the information that defendants had given the Secret Service. That deviation assumes importance later in our analysis of the legal issues, and we thus digress to describe it here in some detail. Contrary to the facts alleged in the complaint, defendants never told the Secret Service that plaintiff was trafficking in "stolen" cellular telephones. According to Special Agent Tamburello's affidavit, Joseph Tazelaar, a Motorola employee, told him that he, Tazelaar, had offered to trade "stolen" cellular telephones in exchange for a copycat box, but plaintiff's principal, Gary Epstein, "had refused to meet with him."

In any event, a search warrant was executed on April 13, 1995. Plaintiff asserted that virtually all of its equipment and vital working documents were confiscated. One year later, the government returned all of the seized items, noting that it did not intend to prosecute. Plaintiff claimed that the disruption in its business caused its demise.

Defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted. *See R.* 4:6-2(e). The Law Division judge dismissed plaintiff's claims for antitrust violations, racketeering, tortious interference with economic advantage and conspiracy, finding that plaintiff was engaged in an illegal business and thus had no legitimate interest subject to protection under New Jersey's tort laws. The court additionally dismissed plaintiff's malicious prosecution action on the grounds that (1) no criminal proceedings were ever instituted against plaintiff, and (2) as a matter of law, defendants' communications with the Secret Service were supported by probable cause. The court dismissed plaintiff's libel and slander claims, finding that the one-year statute of limitations had expired.

## II.

Although not dispositive of all of plaintiff's claims, the critical question is whether "cloning" cellular telephones is illegal. We thus commence our analysis with a concise overview of the relevant rules, regulations and orders adopted by the Federal Communications Commission (FCC).

The cellular telephone industry has been regulated by the federal government since 1981. *See* 47 *U.S.C.A.* §§ 151, 332; *see also In re An Inquiry into the Use of the Bands 825–845 MHz and 870–890 MHz for Cellular Communications Systems; and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems,* 86 *F.C.C.*2d 469 (1981) (First ESN Order). The FCC has complete plenary authority over the industry. 47 *U.S.C.A.* § 151. The Secret Service is one of the principal enforcement agencies dealing with the regulation

of public mobile services and consumer access devices. *See* 18 *U.S.C.A.* § 3056. One of the primary goals of radio airway regulation is to prevent "pirating" or "cellular theft." *See, e.g.,* Report and Order, *In re Revision of Part 22 of the Commission's Rules Governing the Public Mobile Services,* FCC 92–115, 9 *F.C.C.R.* 6513, 76 *Rad. Reg.*2d ¶ 1 (1994) (Second ESN Order); FCC Public Notice 20011, Report No. CL–92–3, *Changing Electronic Serial Numbers on Cellular Phones is a Violation of the Commission's Rules* (Oct. 2, 1991) (FCC Public Notice 20011).

The most common way for individuals to commit cellular theft is to "clone" or copy an active cellular telephone's electronic serial number. Each cellular telephone, by law, must have a unique Electronic Serial Number (ESN) and phone number, which must be set by the manufacturer. *See* 47 *C.F.R.* §§ 22.919 and 22.933 (1998). Simply stated, an ESN is a thirty-two bit binary number that identifies the cellular device to any cellular provider. 47 *C.F.R.* § 22.919. Cellular providers use the ESN as the means of identifying a telephone, ensuring access to the system, tracking telephone usage and billing its customers. Through the development of certain technologies, namely "moto boxes" or "copycat boxes," individuals have been able to "copy" the ESN from an active telephone and transfer it to another telephone. The device also transfers the active telephone's telephone number. The end result is what is commonly referred to as a "clone" or "reconditioned telephone." After the process is complete, any calls made or received by the cloned telephone are tracked and billed by the provider as if they were emanating from the original, factory-set phone.

The potential for mischief is readily apparent. A person who obtains a cloned telephone can make calls that are improperly charged to an innocent consumer's account. The cellular provider has no means of differentiating between calls generated by the defrauder's cloned telephone and calls generated by the innocent consumer's telephone. Plaintiff contends, however, that its "extension" business involved providing lawful cellular customers with

a second telephone. The cloned telephone, of course, has the same ESN number and telephone number as the original store-bought telephone. However, by providing a customer with a cloned "extension" telephone, plaintiff's service permits him or her to have access to the carrier's network and escape periodic service and usage charges on the cloned telephone.

The FCC has adopted a series of rules, regulations and orders designed to combat telephone cloning. *See Second ESN Order*, 76 *Rad. Reg.*2d at ¶ 61. Plaintiff nonetheless contends that the regulatory scheme adopted by the FCC is applicable only to manufacturers of cellular telephones. While it is true that the FCC's order of May 4, 1981 dealing with the subject did not specifically prohibit the transferring of ESNs from one cellular telephone to another, it did expressly state that each telephone must have a unique ESN. 86 *F.C.C.*2d at 508, 593. Moreover, in its public notice issued on October 2, 1991, the FCC stated that telephones "with altered ESNs do not comply with the Commission's rules and any such individual or company operating such [tele]phones or performing such alterations is in violation of Section 22.915 [now 22.933] of the Commission's rules and could be subject to appropriate enforcement action." *FCC Public Notice* 20011.

These regulations and orders have not gone unchallenged. With the enhancement of cellular technology, companies intent on providing "extension" services have repeatedly requested changes in the regulatory framework to "allow [businesses] to market ancillary cellular equipment that emulates ESNs for the purpose of [permitting] more than one cellular [tele]phone to have the same telephone number." *Second ESN Order*, 76 *Rad. Reg.*2d at ¶ 57. The FCC has rebuffed these requests, stating:

> The record before us demonstrates the need for measures that will help reduce the fraudulent use of cellular equipment caused by tampering with the ESN.... [W]e conclude that the practice of altering cellular phones to "emulate" ESNs without receiving the permission of the relevant cellular licensee should not be allowed because (1) simultaneous use of cellular telephones fraudulently emitting the same ESN without the licensee's permission could cause problems in some cellular systems such as erroneous tracking and billing; (2) ... could deprive cellular

carriers of monthly per telephone revenues to which they are entitled; and (3) ... such altered phones ... would be unlicensed transmitters in violation of Section 301 of the Act.

[*Second ESN Order,* 76 *Rad. Reg.*2d at ¶¶ 58, 60.]

The FCC further stated that "any individual or company that knowingly alters cellular telephones to cause them to transmit an ESN other than the one originally installed by the manufacturer is aiding in the violation of [its] rules." *Id.* at ¶ 62.

The most recent revision of FCC regulations adopted on September 4, 1994, specifically provides that "[t]he circuitry that provides the serial number must be isolated from fraudulent contact and tampering." 47 *C.F.R.* § 22.933 (citing Office of Engineering and Technology Bulletin No. 53, Section 2.3.2). The revision provides that "[e]ach mobile transmitter in service must have a unique ESN" that is "factory set and must not be alterable." 47 *C.F.R.* § 22.919(a), (c). The cellular equipment must be designed in such a way that "any attempt to remove, tamper with, or change the ESN chip ... [will] render the mobile transmitter inoperable." 47 *C.F.R.* § 22.919(c). While we recognize that the revised regulations are written in terms of the design and manufacture of cellular equipment, we are satisfied that the regulatory intent was to bar cellular cloning.

While we have found no reported opinion directly on point, our research discloses that other jurisdictions have upheld criminal convictions based upon cellular cloning activities. *See, e.g., United States v. Williams,* 128 *F.*3d 1239 (8th Cir.1997); *United States v. Pervaz,* 118 *F.*3d 1 (1st Cir.1997); *United States v. Watson,* 118 *F.*3d 1315 (9th Cir.1997); *United States v. Clayton,* 108 *F.*3d 1114 (9th Cir.1997), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 233, 139 *L.Ed.*2d 165 (1997); *United States v. Ashe,* 47 *F.*3d 770 (6th Cir.), *cert. denied sub nom. Daughtrey v. United States,* 516 *U.S.* 859, 116 *S.Ct.* 166, 133 *L.Ed.*2d 108 (1995); *People v. Lawrence,* 169 *Misc.*2d 752, 647 *N.Y.S.*2d 675 (Sup.Ct.1996). *But see United States v. Brady,* 13 *F.*3d 334 (10th Cir.1993). We note that federal courts that have had occasion to consider the issue have consistently held that such activities violate § 1029 of Title 18 which

makes the fraudulent cloning of consumer access devices a crime. Although no prosecution was commenced in this case, that was a matter within the discretion of the Secret Service, and is not inconsistent with the conclusion we have reached. Of course, we have no occasion to decide whether cellular cloning falls within New Jersey's criminal statutes. We merely hold that the practice of cellular cloning does not constitute a lawful business enterprise under federal statutes and regulations.

### III.

We next focus upon the legal ramifications flowing from our conclusion that plaintiff's business violated federal law. Although ambiguously phrased, plaintiff argues that the causes of action alleged in the complaint survive notwithstanding the unlawful nature of its cellular cloning activities. In support of its position, plaintiff relies on *Kiefer–Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 *U.S.* 211, 71 *S.Ct.* 259, 95 *L.Ed.* 219 (1951), *overruled on other grounds, Copperweld Corp. v. Independence Tube Corp.*, 467 *U.S.* 752, 104 *S.Ct.* 2731, 81 *L.Ed.*2d 628 (1984); *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 *U.S.* 134, 88 *S.Ct.* 1981, 20 *L.Ed.*2d 982 (1968), *overruled on other grounds, Copperweld Corp. v. Independence Tube Corp.*, 467 *U.S.* 752, 104 *S.Ct.* 2731, 81 *L.Ed.*2d 628 (1984); and *Health Corp. of America v. New Jersey Dental Ass'n*, 424 *F.Supp.* 931 (D.N.J. 1977). We find these decisions inapposite.

In all three cases, the plaintiffs instituted antitrust actions in which they sought treble damages. In *Kiefer–Stewart*, the plaintiff agreed with other wholesalers who were named as defendants, to set minimum prices for the sale of liquor in violation of the antitrust laws. The defendants asserted that the plaintiff lacked standing because it was a willing participant in the unlawful scheme. The Supreme Court held that this was no defense to the defendants' own illegal conduct, noting that "[t]he alleged illegal conduct of [the plaintiff] ... could not legalize the unlawful combination by [defendants] nor immunize them against liability

to those they injured." 340 *U.S.* at 214, 71 *S.Ct.* at 261, 95 *L.Ed.* at 224. In *Perma*, the plaintiffs were dealers who operated Midas Muffler Shops. They brought suit against Midas and its subsidiaries, alleging that the sales agreements that they had made with the defendants were in violation of the antitrust laws. 392 *U.S.* at 136, 88 *S.Ct.* at 1983, 20 *L.Ed.*2d at 988–89. The defendants asserted that the plaintiffs' participation in the unlawful combination barred them from seeking damages for antitrust violations. *Id.* at 140, 88 *S.Ct.* at 1985, 20 *L.Ed.*2d at 991. The Supreme Court rejected this defense, reasoning:

[T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct.

[392 *U.S.* at 139, 88 *S.Ct.* at 1984, 20 *L.Ed.*2d at 990.]

In *Health Corp.*, the plaintiffs brought an antitrust action against corporations involved in the operation of dental health plans. The defendants contended that plaintiff could not seek the protection of the antitrust laws because the New Jersey State Board of Dentistry had found that it had unlawfully engaged in the practice of dentistry in violation of the Dental Practice Act (*N.J.S.A.* 45:6–1 to –47). 424 *F.Supp.* at 932. The district court denied the defendants' motion to dismiss, finding that the plaintiffs' technical violations of the statute should not deprive it of the right to seek damages for antitrust violations. *Id.* at 934.

These decisions are clearly distinguishable. In *Kiefer–Stewart* and *Perma*, the plaintiffs were guilty of the same type of anticompetitive activity with which the defendants were charged. The Supreme Court was, nevertheless, unwilling to insulate those defendants from the effect of the antitrust laws. In *Health Corp.*, the plaintiffs' failure to obtain a license under the Dental Practice

Act constituted a technical violation. But the business activity of plaintiffs—the administration of a dental health program—was not criminal or contrary to public policy, and plaintiffs could bring their activities within the law with minor operational changes.

In contrast, plaintiff in this case was engaged in an inherently illegal business in direct violation of federal law. *See* 18 *U.S.C.A.* § 1029. Unlike *Kiefer–Stewart, Perma,* and *Health Corp.,* which were grounded in the strong national policy of encouraging private enforcement of the antitrust laws, no public interest would be vindicated and no societal benefit would be obtained by judicial protection of plaintiff's illegitimate business activity. To the contrary, recognition of plaintiff's claims for antitrust violations, RICO, tortious interference with economic advantage and conspiracy would serve to further plaintiff's unlawful enterprise. *See Fineman v. Armstrong World Indus., Inc.,* 774 *F.Supp.* 225, 234–35 (D.N.J.1991), *rev'd in part,* 980 *F.*2d 171 (3d Cir.1992), *cert. denied,* 507 *U.S.* 921, 113 *S.Ct.* 1285, 122 *L.Ed.*2d 677 (1993). Plaintiff "had no legal rights to protect," and "[t]herefore, defendants could not invade them." *Maltz v. Sax,* 134 *F.*2d 2, 5 (7th Cir.), *cert. denied,* 319 *U.S.* 772, 63 *S.Ct.* 1437, 87 *L.Ed.* 1720 (1943).

We stress the limited contours of our holding. We do not suggest that a citizen may take whatever action he deems necessary to combat an unlawful enterprise. A person setting fire to an illegal gambling house, for example, could not reasonably urge immunity from civil suit based upon the righteousness of his cause. Clearly, the principle we apply in this case has its limitations in the context of other situations. But here, we perceive no injustice in denying plaintiff a remedy where it has demonstrated no property or business interest, present or future, that is deserving of legal protection.

## IV.

We treat separately plaintiff's remaining claims for malicious prosecution and libel and slander. We first consider plain-

tiff's contention that the Law Division erred by dismissing the claim for malicious prosecution. A malicious prosecution action requires proof that (1) a criminal action was instituted by defendant, (2) it was actuated by malice, (3) there was an absence of probable cause for the proceeding, and (4) it was terminated favorably to the plaintiff. *Lind v. Schmid,* 67 *N.J.* 255, 262, 337 *A.*2d 365 (1975). In dismissing plaintiff's claim, the Law Division concluded that execution of the search warrant by the Secret Service did not constitute the institution of criminal proceedings. We need not address this point. *See Geyer v. Faiella,* 279 *N.J.Super.* 386, 652 *A.*2d 1245 (App.Div.), *certif. denied,* 141 *N.J.* 95, 660 *A.*2d 1194 (1995) (refusal of a grand jury to return an indictment constitutes "favorable termination" of criminal proceedings sufficient to enable plaintiff to maintain a malicious prosecution action). Instead, we choose to affirm the dismissal on the surer ground that defendants had probable cause to inform the Secret Service of plaintiff's illegal activities. *See Westhoff v. Kerr Steamship Co., Inc.,* 219 *N.J.Super.* 316, 321–22, 530 *A.*2d 352 (App.Div.), *certif. denied,* 109 *N.J.* 503, 537 *A.*2d 1292 (1987).

We also sustain the Law Division's dismissal of plaintiff's claim for libel and slander. The court found that plaintiff's complaint was filed after expiration of the one-year limitations period. *See N.J.S.A.* 2A:14–3. The statute begins to run at the time the defamatory statements were made to a third person. *Gnapinsky v. Goldyn,* 23 *N.J.* 243, 252, 128 *A.*2d 697 (1957). Our Supreme Court has held that the discovery rule is inapplicable to the statute of limitations for libel and slander. *See Lawrence v. Bauer Publ'g & Printing Ltd.,* 154 *N.J.Super.* 271, 276, 381 *A.*2d 358 (App.Div.1977), *rev'd on dissent,* 78 *N.J.* 371, 396 *A.*2d 569 (1979). The Court's holding substantially undercuts plaintiff's argument that publication of the statements occurred at the time the affidavit in support of the search warrant was unsealed. Recently, however, the Court questioned the soundness of its prior ruling, noting the intention to revisit the issue in a case in which the problem is squarely presented. *Williams v. Bell Tel. Lab., Inc.,* 132 *N.J.* 109, 120, 623 *A.*2d 234 (1993).

██ We do not dwell upon the question. We are entirely satisfied that defendants' statements to the Secret Service charging a criminal violation were qualifiedly privileged. *Id.* at 120–21, 623 *A.*2d 234; *see also Rainier's Dairies v. Raritan Valley Farms, Inc.,* 19 *N.J.* 552, 562, 117 *A.*2d 889 (1955); *Restatement (Second) of Torts* § 598, comment f (1976). Nothing in the complaint or in the documentary submissions made in opposition to defendants' motion to dismiss indicates that the qualified privilege was abused. *See Dairy Stores, Inc. v. Sentinel Publ'g Co., Inc.,* 104 *N.J.* 125, 151, 516 *A.*2d 220 (1986); *see also Erickson v. Marsh & McLennan Co., Inc.,* 117 *N.J.* 539, 565–66, 569 *A.*2d 793 (1990) (plaintiff must establish abuse of privilege by clear and convincing evidence). The public interest in obtaining the information far "outweigh[ed] [plaintiff's] individual[ ] right to protect [its] reputation." *Dairy Stores, Inc. v. Sentinel Publ'g Co., Inc.,* 104 *N.J.* at 151, 516 *A.*2d 220.

Finally, it is perfectly evident that defendants' statements to the Secret Service were true. The tenor of these statements was that plaintiff was engaged in the unlawful business of cloning cellular telephones, and that its use of a moto box for that purpose was improper. We discern nothing false in these representations. In its complaint, plaintiff additionally alleged that a Motorola employee told the Secret Service that plaintiff had offered to exchange a moto box for stolen cellular telephones. As we noted earlier in our opinion, the allegation that appears in plaintiff's complaint on that point is plainly inaccurate. Special Agent Tamburello recounted in his affidavit submitted in support of the search warrant that he was told by Tazelaar, a Motorola employee, that he, Tazelaar, had offered to trade "stolen" cellular telephones in exchange for a copycat box, but that plaintiff's principal, Gary Epstein, rebuffed him. Although a motion to dismiss for failure to state a claim is decided by examining the legal sufficiency of the facts alleged on the face of the complaint, *Printing Mart–Morristown v. Sharp Elecs. Corp.,* 116 *N.J.* 739, 746, 563 *A.*2d 31 (1989), *R.* 4:6–2 permits the court to consider a party's presentation of "matters outside the pleading," thus converting the motion into an

application for summary judgment. *See Wang v. Allstate Ins. Co.,* 125 *N.J.* 2, 9, 592 *A.*2d 527 (1991); Pressler, *Current N.J. Court Rules,* comment on *R.* 4:6–2 (1998). Special Agent Tamburello's affidavit, which was submitted to the Law Division by plaintiff, is part of the appellate record. Assuming the accuracy of the agent's account, the statement made clearly did not have the capacity to impugn plaintiff's reputation.

In sum, we discern no sound basis to vitiate the Law Division's judgment. Accordingly, the order of dismissal is affirmed.