ON APPLICATION FOR REHEARING
The opinion of August 4, 1995, is withdrawn and the following is substituted therefor.
Bridgette L. Patrick appeals from a summary judgment for Union State Bank in her action alleging that the bank negligently allowed an imposter to open a checking account in Ms. Patrick's name. The imposter wrote several worthless checks on the account, and as a result Ms. Patrick was subsequently arrested and incarcerated. The issues are whether the bank owed a duty to Ms. Patrick and whether Ms. Patrick met her evidentiary burden on the question of proximate cause.
 I.
In April 1990, Ms. Patrick applied for renewal of her Alabama driver's license and was issued a temporary license pending the issuance of a new permanent license. An Alabama temporary driver's license does not contain a picture of the licensee. Several weeks later, Ms. Patrick discovered that the temporary license and her Rich's department store credit card were missing from her wallet. Ms. Patrick reported to Rich's that the credit card was missing, and she subsequently received her permanent driver's license in the mail.
On May 10, 1990, a person calling herself "Bridgette Patrick," and using Ms. Patrick's temporary driver's license as identification, opened a checking account with a deposit of $100 at the Pell City branch of Union State Bank. Kim Abbott, the bank employee who opened the account, testified that the imposter stated that she had only one form of identification, that she had no permanent address because, she said, she was currently living at a shelter for abused women, and that she was trying to find a job and a place to live. Ms. Abbott also testified that she noticed that the imposter did not completely sign her last name on the account signature card; that she noticed that the signature on the card was different from the signature on Ms. Patrick's temporary driver's license; that she did not ask the imposter to verify the Social Security number by presenting a Social Security card; and that she did not attempt to verify either of the telephone numbers given to her by the imposter. Ms. Abbott did use a computerized banking information system called the "CHEX System" to determine whether "Bridgette Patrick" had any negative banking history; however, the system revealed no banking history at all on Bridgette Patrick.
With the checks given to her upon opening the account, the imposter proceeded to write checks totalling approximately $1,500 to merchants over a wide area of Jefferson and Shelby Counties. The first three checks exhausted the $100 deposit, and numerous "not sufficient funds" notices were then sent to the post office box address given by the imposter upon opening the account. The *Page 1366 
notices were returned to the bank marked "Attempted, Not Known." No notices were mailed to the address on Ms. Patrick's temporary driver's license. On May 31, 1990, the bank closed the account. The checks were returned as "not sufficient funds" items to the merchants, who had accepted the checks as payment for merchandise. The merchants then initiated proceedings that resulted in warrants being issued in 11 jurisdictions[1] for the arrest of Bridgette Patrick for issuing worthless checks.
Some months after Ms. Patrick discovered that her temporary license and Rich's card were missing, she received a notice from the City of Adamsville informing her that it had an outstanding warrant for her arrest. Ms. Patrick's father inquired as to the source of the warrant and was informed that Ms. Patrick had been charged with issuing worthless checks. Ms. Patrick then reported to the police in Adamsville, and her handwriting was compared to that found on the checks. The handwriting did not match, and the charges were dismissed. Subsequently, Ms. Patrick received a notice from the City of Birmingham informing her that it had issued a warrant for her arrest for issuing a worthless check. Ms. Patrick then reported to the police in Birmingham, and the charge was dismissed after her handwriting was compared to that found on the check. Ms. Patrick testified that she asked one of the Birmingham officials whether she needed a lawyer and was told no, because there did not appear to be any more checks. Ms. Patrick also testified that, at the time, she assumed that there must be another person by the name of "Bridgette Patrick."
In the summer of 1992, while Ms. Patrick was traveling through Montevallo with her mother and her six-month old baby, she was stopped by the Montevallo police for allegedly running a red light. After Ms. Patrick's driver's license was checked, she was arrested at the scene on the basis of outstanding warrants in Shelby County for issuing worthless checks. Although the officials in Shelby County concluded that Ms. Patrick's handwriting did not match the handwriting on the checks, she was held overnight because of outstanding warrants in other jurisdictions.
The following morning, Ms. Patrick was picked up at the Shelby County Jail by the City of Hoover on a warrant for issuing worthless checks. Ms. Patrick was arrested, photographed, fingerprinted, required to change into jail clothes, and held for 72 hours. Upon release by the City of Hoover, Ms. Patrick was taken into custody by the City of Fairfield on a charge of issuing worthless checks; she was incarcerated there for approximately two days and then released into the custody of the City of Midfield. Ms. Patrick was held by the City of Midfield for 24 hours on a warrant for issuing worthless checks; she was then released into the custody of the City of Homewood. Ms. Patrick was held overnight in Homewood and then released into the custody of her mother. Ms. Patrick's mother then had to take her immediately to the City of Leeds to sign a signature bond.
The total time of Ms. Patrick's incarceration came to approximately 10 consecutive days, and it was followed by numerous court appearances in the various jurisdictions. All of the charges against Ms. Patrick were eventually dismissed. The imposter has not been found.
Ms. Patrick brought an action against Union State Bank, alleging that the bank "negligently allowed a[n] unknown female, fraudulently posing as Plaintiff, to open a checking account . . . [by] fail[ing] to demand proper identification from said person seeking to open the account and . . . fail[ing] to verify information which had been obtained at the time the account was opened." The bank moved for a summary judgment, averring that there was no genuine issue of material fact and that it was entitled to a judgment as a matter of law. The circuit court granted the motion, holding that there were no material facts in dispute and that Ms. Patrick had not presented substantial evidence that would support a finding of the essential elements of duty and proximate cause. *Page 1367 
 II.
"The existence of a duty to the plaintiff is fundamental to a negligence claim." Graveman v. Wind Drift Owners' Ass'n,Inc., 607 So.2d 199, 203 (Ala. 1992) (citing City of Bessemer v.Brantley, 258 Ala. 675, 65 So.2d 160 (1953)). The bank's position is that in opening new accounts it has no legal duty to use due care to protect members of the general public from fraud perpetrated by a third party who might open a checking account as an imposter. In response to this argument, Ms. Patrick presented the affidavit of Timothy Gruber, who identified himself as a bank security expert. Based on his security background and five years' experience as the director of corporate security for First Alabama Bank in Birmingham, Mr. Gruber expressed the opinion that almost all banks require photographic identification and that banks do this not only for their own protection, but for the protection of others as well. Moreover, Mr. Gruber stated that banks should compare the signature on the potential customer's identification with the signature on the bank's signature card. According to Mr. Gruber, it follows that several factors should have alerted the bank teller that the person opening the account in Bridgette Patrick's name was, in fact, an imposter. This included the lack of photographic identification, the different signatures on the stolen driver's license and the signature card, the incomplete signature on the signature card, and the different addresses presented by the imposter.
The bank notes that it is a rule in Alabama that, absent a special relationship or special circumstances, a person has no duty to protect another from criminal acts of a third person.
This rule is most commonly applied in cases in which a business invitee or employee seeks to impose liability on a premises owner or employer for injuries or damage resulting from the criminal acts of a third party committed on the owner's or employer's premises. See Habich v. Crown CentralPetroleum Corp., 642 So.2d 699 (Ala. 1994); Dailey v. HousingAuthority for Birmingham Dist., 639 So.2d 1343 (Ala. 1994);Bailey v. Bruno's, Inc., 561 So.2d 509 (Ala. 1990); Moye v. A.G.Gaston Motels, Inc., 499 So.2d 1368 (Ala. 1986); Ortell v.Spencer Cos., 477 So.2d 299 (Ala. 1985); Henley v. Pizitz RealtyCo., 456 So.2d 272 (Ala. 1984); Latham v. Aronov Realty Co.,435 So.2d 209 (Ala. 1983); Berdeaux v. City National Bank,424 So.2d 594 (Ala. 1982); Parham v. Taylor, 402 So.2d 884 (Ala. 1981) (citing 10 A.L.R.3d 619).[2] The rule has also been applied in cases in which a plaintiff sought to impose liability upon a psychiatrist for injuries resulting from criminal assault by the psychiatrist's patient where the patient was allegedly negligently diagnosed or negligently released from commitment by the psychiatrist. See Morton v. Prescott, 564 So.2d 913
(Ala. 1990); King v. Smith, 539 So.2d 262 (Ala. 1989).
The cases applying the rule address the question whether a defendant owes a duty to protect the plaintiff from violent physical criminal acts of a third person. In fact, the rule has been stated as being that "one has no duty to protect another from criminal attack by a third party." Roberson v. AlliedFoundry Machinery Co., 447 So.2d 720, 723 (Ala. 1984) (emphasis added); accord Gaskin v. Republic Steel Corp.,420 So.2d 37 *Page 1368 
(Ala. 1982) (setting out the test in Parham, supra, "for imposing liability on an employer for assaults by third parties on his employees") (emphasis added). Those cases applying the general rule have, for the most part, involved criminal assaults. The state's police power to prevent or punish such assaults involves the state's threat or use of force. Despite police protection and the deterrent value of such protection, citizens are victimized by criminal acts occurring in the home, in the workplace, and in public. See Henley v. Pizitz RealtyCo., 456 So.2d 272 (Ala. 1984). By recognizing that there is often no civil remedy in these cases, we acknowledge that the police powers belong to the state. Imposing a duty on defendants to protect members of the public from criminal assaults by third persons would undercut the state's monopoly on the use of force. Implicitly, we have rejected the imposition of a duty in these cases because such a duty would encourage citizens to resort to the use of force to deter criminal attacks. This case does not involve physical acts of violence or criminal assault.
An important distinction, aside from the absence of a criminal assault, is that this case involves whether the bank owes a legal duty to protect the plaintiff in the execution of an inherent component of the bank's business, whereas the previous cases applying the rule involve whether the defendant owed a duty to protect the plaintiff in a manner essentially unrelated, or at least not directly related, to the defendant's business or profession. There is such a close nexus between the negligent or wanton acts of the defendant in this case and the ultimate success of the criminal scheme that concerns associated with imposing a general duty to prevent criminal assaults are not implicated. Ordinarily, the successful commission of a criminal act, whether it be a violent criminal attack against the person or a nonviolent criminal act related to property, is not directly dependent upon acts or omissions of defendants typically protected by the general rule. The question whether a bank owes a duty to use due care in opening a checking account is fundamentally different from the question whether it owes a duty to employ a private security force sufficient to deter any threat of robbery. See Berdeaux, supra.
The bank argues that the general rule should be applied in this case irrespective of the lack of a criminal assault, citing cases involving security companies that have been shielded from liability through application of the general rule. Although providing security is certainly an inherent component of a security company's business, such a company can not guarantee safety, and the successful criminal scheme is not wholly dependent on acts or omissions of the security company. On the other hand, the success of the imposter's scheme in this case was directly related to the bank teller's failure to properly verify the identification presented. The security company may attempt to prevent crime, within limits; here, the bank, through its negligence or wantonness, actually facilitated the crime.
Thus, we are persuaded that the categorization of the duty question as whether the defendant owes a duty to protect the plaintiff from the criminal acts of a third party is not accurate on the facts of this case. Although the general rule is often stated broadly, review of its application in our cases reveals that it is not controlling on the facts of this case. The basis of the rule, however, is applicable in the analysis of proximate cause, as discussed below.
Thus, the question whether the bank owed Ms. Patrick a duty to exercise due care in opening checking accounts should be analyzed according to traditional principles. Whether a legal duty exists is a question of law. Albert v. Hsu, 602 So.2d 895
(Ala. 1992) (citing Rose v. Miller Co., 432 So.2d 1237
(Ala. 1983)). This Court has relied upon the following principles relating to the question of duty:
 "In general, 'every person owes every other person a duty imposed by law to be careful not to hurt him.' In determining whether a duty exists in a given situation, however, courts should consider a number of factors, including public policy, social considerations, and foreseeability. The key factor is whether the injury was foreseeable by the defendant. The essential question is 'whether the plaintiff's interests *Page 1369 
are entitled to legal protection against the defendant's conduct.' "
Smitherman v. McCafferty, 622 So.2d 322, 324 (Ala. 1993) (citations omitted). In addition to the key factor of foreseeability, this Court has recognized three related considerations in determining whether a duty exists: "the nature of the defendant's activity; . . . the relationship between the parties; and . . . the type of injury or harm threatened." Morgan v. South Central Bell Telephone Co.,466 So.2d 107, 114 (Ala. 1985) (citing W. Prosser, Selected Topicsin the Law of Torts, at 655 (1984)).
In a case upholding legislative regulation of the banking industry, this Court noted, generally:
 "Banks stand in the intimate relation of a fiduciary to those who are their customers, depositors, stockholders, and associate banks, as well as the public generally, whose members are affected by their operation. Ordinary corporations handle their own money, but banks handle the money of other individuals. They are quasi-public corporations by nature, subject to regulation and supervision by the state."
Security Trust Savings Bank v. Marion County Banking Co.,287 Ala. 507, 513, 253 So.2d 17, 21 (1971). Of course, banks do not actually have a legal fiduciary duty to the public at large,see Bank of Red Bay v. King, 482 So.2d 274 (Ala. 1985) (noting that special circumstances are necessary to impose on a bank a fiduciary duty to disclose, because the relationship between a bank and its customer has been traditionally viewed as merely a creditor-debtor relationship), but the quotation from SecurityTrust illustrates the importance of, and the public trust placed in, the banking industry. Thus, the nature of the activity of a bank, such as Union State Bank, is such that some duty to the public in the exercise of the bank's business may be justifiably imposed.
The bank argues that there can be no duty because, it says, there was absolutely no relationship between the bank and Ms. Patrick. We disagree. The bank undeniably thought that it had a relationship with Ms. Patrick when it opened the account for, and gave checks to, an imposter; and the fact that the bank opened a checking account under the name "Bridgette Lashawn Patrick," under Ms. Patrick's Social Security number, and based solely upon the presentation of Ms. Patrick's temporary driver's license as identification, persuades us that there is some relationship between the parties. The fact that the relationship defies common categorization does not mean that there is no relationship.
The remaining question is whether the type of injury or harm threatened is such that the imposition of tort liability is appropriate. We conclude that the fraudulent scheme effectuated here, as well as the injury and harm it caused Ms. Patrick, was foreseeable to the extent that a duty may be imposed. The issuance of worthless checks is extremely likely to result from opening a checking account for, and giving checks to, an imposter: why else would a person open a checking account in another's name when the person has no relationship with the other? Arrest and incarceration of the person in whose name and Social Security number and upon whose identification such an account was opened are probable consequences of the issuance of worthless checks in such a situation. It is foreseeable to banks that failing to follow identification procedures will greatly increase the risk of fraud. It endangers the bank, the bank's customers, and the general public. Thus, as a matter of law, it is foreseeable, in terms of the question of duty, that the person in whose name and Social Security number and upon whose identification a checking account is opened may be injured or harmed by fraud if the bank does not employ commercially reasonable means to verify that the person opening the account and to whom checks are given is not an imposter.
Furthermore, the evidence in this case also could support a conclusion that the bank was in the best position to prevent the fraud that injured Ms. Patrick. First, while Ms. Patrick is responsible for keeping up with her driver's license, it is the bank that provided the imposter with the means to perpetrate the fraud, namely the checks. Second, although the bank seeks to imply that, after being notified of outstanding warrants for *Page 1370 
writing worthless checks in two jurisdictions, Ms. Patrick could have discovered and corrected the warrants in the other nine jurisdictions, Ms. Patrick testified that, at that time, she did not suspect the fraud that had actually occurred, but, rather, that she believed that there was another "Bridgette Patrick" with whom she had been confused, and, even if Ms. Patrick suspected the fraud, the task of discovering which of all of the possible jurisdictions had issued warrants for her arrest is quite onerous in comparison with the steps the bank could have taken to ensure that an account was not opened by, and checks given to, an imposter — for example, requiring photographic identification, or verifying any of the information given by the imposter, or at least ascertaining that the applicant's signature matches the signature on the identification.
While we recognize that strict observance of an identification policy does not provide a fool-proof mechanism to deter banking fraud, we can say with certainty that identification, properly verified at the point of contact, substantially reduces the risk of fraud. The utilization ofestablished identification policies protects the bank, the bank's customers, and the general public from the very type of criminal activity in question today. Unlike scenarios involving criminal attacks, in this scenario it is the bank, not the state, that is in the best position to safely and effectively deter this type of conduct, and the bank can do it without assuming any undue burden. The bank argues that imposing such a duty would place an unbearable burden on the industry. The contention that requiring banks to actually follow identification policies would preclude countless numbers of Alabama citizens without picture identification from opening accounts and would prevent potential customers from opening accounts for weeks while the bank performs exhaustive background checks is without merit. The fact that banks now, as a matter of policy, request identification during face-to-face banking transactions undercuts the force of this argument. It is commercially reasonable for banks to verify the authenticity of signatures by comparison. See Commercial Credit Equip. Corp.v. First Alabama Bank, 636 F.2d 1051, 1055 (5th Cir. 1981). Here, the bank teller had actual notice of a discrepancy between the handwriting on the temporary driver's license and the incomplete signature on the signature card, yet opened the account in spite of that discrepancy.
We find that the analysis and conclusion in Liberty Nat'lLife Ins. Co. v. Weldon, 267 Ala. 171, 100 So.2d 696 (1957), on the question of duty support our resolution of the issue here. In Liberty National, the father of a 2 1/2 year-old child murdered by the child's aunt by marriage brought a negligence action against three insurers that had issued life insurance policies on the life of the child to the aunt by marriage, who did not have an insurable interest in the life of the child.[3]
This Court characterized one of the issues presented as whether a life insurance company owes a "duty to use reasonable care not to issue a policy of life insurance in favor of a beneficiary who has no interest in the continuation of the life of the insured." 267 Ala. at 185, 100 So.2d at 708. The Court held that such a duty exists, and noted:
 "Where this court has found that such policies are unreasonably dangerous to the insured because of the risk of murder and for this reason has declared such policies void, it would be an anomaly to hold that insurance companies have no duty to use reasonable care not to create a situation which may prove to be a stimulus for murder."
267 Ala. at 186, 100 So.2d at 708.
While the duty imposed in Liberty National was clearly based, in part, upon the fact that such insurance policies were void as against public policy, we note that the rationale of that public policy is that the injury or *Page 1371 
harm from the issuance of such policies is foreseeable, if not likely. See Helmetag's Adm'x v. Miller, 76 Ala. 183 (1884) (noting that " 'such policies, if valid, . . . furnish strong temptations to the party interested to bring about, if possible, the event insured against' "). Thus, it was foreseeable that the issuance of life insurance policies on the life of a person as to whom the beneficiary had no insurable interest was likely to provide a stimulus for murder, and, therefore, a company issuing a life insurance policy was held to owe a duty to use reasonable care to ascertain whether the intended beneficiary of the policy had an insurable interest in the life of the person to be insured. Obviously, the same line of analysis applies here: if it is foreseeable that the person in whose name and Social Security number and upon whose identification a checking account is opened could be arrested and detained as a result of the bank's opening the account without employing commercially reasonable means of verifying that the person opening the account and to whom the checks are given is not an imposter, then a duty may be imposed upon the bank.[4]
Thus, the evidence could support a conclusion that the type of injury or harm threatened was foreseeable and that the bank was in the best position to prevent the fraud, and therefore that the imposition of tort liability could be appropriate. Precedent from this Court also supports this conclusion. Therefore, we hold that a bank owes a duty of reasonable care to the person in whose name, and upon whose identification, an account is opened to ensure that the person opening the account and to whom checks are given is not an imposter.
 III.
The circuit court also based its summary judgment upon the issue of proximate cause. This Court has enunciated the standard for determining the issue of proximate cause in a case of this nature, as follows:
 " 'The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct should have realized the likelihood that such a situation might be created thereby and that a third person might avail himself of the opportunity to commit such a tort or crime.' "
Liberty Nat'l Life Ins. Co. v. Weldon, 267 Ala. at 188,100 So.2d at 710 (quoting Restatement of the Law of Torts § 448);accord Thetford v. City of Clanton, 605 So.2d 835, 840
(Ala. 1992). We have determined that, as a matter of law, the fraudulent acts of the imposter here were foreseeable to the extent that a duty may be imposed on the bank. Therefore, the issue is whether Ms. Patrick presented substantial evidence creating a genuine issue of material fact as to whether the fraudulent acts of the imposter were foreseeable to the extent of supporting a finding of proximate cause, an issue for the trier of fact.
The bank argues that there is no genuine issue of material fact because Kim Abbott, the bank employee who opened the account, testified that she believed that the person opening the account was Bridgette Patrick, that she did not know that the temporary driver's license was stolen, and that she did not think, at the time the account was opened, that it was probable or likely that the person who opened the account would proceed to write worthless checks that would lead to the arrest and incarceration of the plaintiff. The bank's position is that, for it to have a duty, the employee opening the account must have had, subjectively, a specialized knowledge of the probability or likelihood that conduct is occurring that could endanger the plaintiff, and that, unless the employee had such knowledge, the act of the imposter was a superseding cause. *Page 1372 
The bank's argument is without merit. The standard of foreseeability, as it applies to the question of proximate cause in this case, is whether the bank "should have realized the likelihood" that a situation that afforded an opportunity for an imposter to write worthless checks that would lead to the arrest and incarceration of the plaintiff might be created by the bank's opening a checking account for an individual based solely on the presentation of a temporary driver's license for identification and without verifying any of the information given. The standard is objective, and, while Ms. Abbott's testimony may be relevant, it is not controlling; Ms. Patrick's cause of action is against the bank itself.
In opposition to the bank's motion for summary judgment, Ms. Patrick presented the deposition testimony of Union State Bank's data processing operations officer, who testified that there is concern within the banking industry that persons not properly identified might use stolen identification to open a checking account and proceed to pass fraudulent checks. She also presented the affidavit of Timothy Gruber, offered as that of a bank security expert, who stated, and supported, his conclusions that the bank knew of the existence of widespread fraud against the banking industry and that the bank should have been aware of the possibility that someone would impersonate another in order to open a fraudulent account in the other's name. In particular, Mr. Gruber stated that several factors should have alerted the bank teller that the person opening the account in Bridgette Patrick's name was an imposter. We conclude that Ms. Patrick submitted substantial evidence creating a genuine issue of material fact as to whether the fraudulent acts of the imposter were foreseeable to the extent of supporting a finding of proximate cause.
Because we have determined that, as a matter of law, the bank owed a duty and because Ms. Patrick met her evidentiary burden on the issue of proximate cause, the circuit court erred in entering the summary judgment for the bank.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; REVERSED AND REMANDED.
HOOPER, C.J., and SHORES, KENNEDY, and COOK, JJ., concur.
BUTTS, J., concurs in the result.
MADDOX and HOUSTON, JJ., dissent.
[1] Jefferson and Shelby Counties, and the cities of Adamsville, Bessemer, Birmingham, Fairfield, Gardendale, Homewood, Hoover, Leeds, and Midfield issued such warrants.
[2] The "special relationship or special circumstances" exceptions to the rule have also developed in premises liability cases. The "special relationship" exception was applied in Young v.Huntsville Hospital, 595 So.2d 1386 (Ala. 1992), wherein this Court held that a hospital owes a duty to an anesthetized or sedated patient to protect the patient from the criminal acts of a third party. The Court's holding was based on the fact that the anesthetized or sedated plaintiff was "unable, or less able, to protect herself from an assault," and was, therefore, "dependent" upon the hospital. 595 So.2d at 1388, 1389. This Court has also found that there are "special circumstances" where a premises owner or employer "possessed actual or constructive knowledge that criminal activity which could endanger an invitee [or employee] was a probability." Moye, 499 So.2d at 1371 (quoting Ortell, 477 So.2d at 299); accordHenley, supra; Stripling v. Armbrester, 451 So.2d 789
(Ala. 1984). The key to the "specialized knowledge" exception is foreseeability, and this Court has adopted an objective standard for foreseeability where the "number and frequency of prior criminal acts at the place where the injury occurred are used in determining whether a particular criminal act was reasonably foreseeable." Moye, 499 So.2d at 1372.
[3] The Court summarized two counts of the complaint as follows:
 "Counts 3 and 6 alleg[e] that the acts of the defendants placed the insured child in a zone of danger, with unreasonable risk of harm to her and that the defendants in issuing the alleged illegal contracts of insurance knew, or by the exercise of reasonable diligence should have known, that the beneficiary, Mrs. Dennison, had no insurable interest in the life of the insured."
267 Ala. at 178, 100 So.2d at 700.
[4] We note that the Court held in Liberty National, in addressing the issue of proximate cause, that actionable negligence may be predicated upon foreseeable intervening criminal acts,267 Ala. at 188, 100 So.2d at 710-11, but did not apply or cite the rule now broadly stated as "absent a special relationship or special circumstances, a person has no duty to protect another from criminal acts of a third person." Accord Thetford v. City ofClanton, 605 So.2d 835 (Ala. 1992).