954 A.2d 550 (2008)
402 N.J. Super. 430
Howard D. BRUNSON, Plaintiff-Appellant,
v.
AFFINITY FEDERAL CREDIT UNION and Jim Wilcox, individually and as agent/employee of Affinity Federal Credit Union, Defendants-Respondents.
No. A-4439-06T1.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 2008.
Decided September 9, 2008.
*553 Anthony J. Cariddi argued the cause for appellant (Cariddi and Garcia, attorneys; Mr. Cariddi, of counsel; Carol J. Garcia, on the brief).
David J. Dering, Cedar Knolls, argued the cause for respondent (Leary, Bride, Tinker & Moran, attorneys; Mark Bongiovanni and Peter M. Bouton, on the brief).
Before Judges WEFING, PARKER and KOBLITZ.
The opinion of the court was delivered by
PARKER, J.A.D.
Plaintiff Howard D. Brunson appeals from an order entered on March 30, 2007 granting summary judgment dismissing the complaint against defendants Affinity Federal Credit Union (Affinity) and Jim Wilcox. We reverse and remand.
This is a malicious prosecution action that began with the theft of plaintiff's identity. In October 2002, an individual opened an account at Affinity in plaintiff's name, using plaintiff's social security number and a New Jersey non-driver's identification card with plaintiff's date of birth and address. The identification card showed plaintiff's address in the City of Paterson, but misspelled the city name by including two "t" s. The individual then deposited $25.00 and withdrew fraudulent checks totaling $9,506.82.
Defendant Wilcox is a Certified Fraud Examiner employed as Affinity's Fraud and Loss Prevention Specialist. Wilcox investigated the losses on the account. He identified the individual who opened the account on seven different surveillance tapes and had photographs of that individual each time he engaged in a transaction on the account. Moreover, Wilcox obtained a description of the individual from the bank personnel who dealt with him. He was described as a black male, five feet six inches tall. The fraudulent identification card also listed the individual's height at five feet six inches. Plaintiff is six feet three inches  nine inches taller than the individual who perpetrated the fraud. Wilcox verified that no one named Howard Brunson was an employee of Viva International Group (Viva), the organization against which the fraudulent checks were drawn, nor was he authorized to sign checks for the company.
Wilcox had been advised by the police that an individual named Howard D. Brunson had a criminal record. Nevertheless, Wilcox never reviewed a photo array that included plaintiff's photograph to determine whether he was the same person identified in Affinity's surveillance photos, nor did he review plaintiff's height and weight descriptions, which were included in his criminal record, nor did he note the misspelling of "Patterson" on the identification card.[1] Wilcox further failed to secure photos of plaintiff for Affinity's personnel to identify. Based upon this limited information, however, Wilcox signed two criminal complaints against plaintiff for uttering a forged document and theft by deception.
After signing the criminal complaints, and without further investigation to verify the identity of the individual who cashed *554 the fraudulent checks, Wilcox appeared and testified before a Bergen County Grand Jury, resulting in an indictment against plaintiff and the issuance of an arrest warrant. Wilcox acknowledged that he made no attempt to positively identify the individual from a photo lineup before filing the criminal complaint or testifying before the grand jury. Moreover, he apparently failed to show the police the surveillance photos of the individual who opened the account for comparison with plaintiff's photo.
Plaintiff was arrested on the warrants while visiting his father in Virginia on Father's Day. He was detained in Virginia and extradited to New Jersey, where he was finally released after thirteen days of incarceration. The charges against plaintiff were ultimately dismissed.
In his complaint, plaintiff alleged malicious prosecution, negligent investigation, and negligent hiring of Wilcox by Affinity. As damages, plaintiff seeks only compensation for the thirteen days of incarceration.
In granting defendants' motion for summary judgment, the trial court indicated that the malicious prosecution count should be dismissed because the criminal charges against defendant were dismissed. The court noted, however, that when plaintiff was arrested, the criminal judge and the prosecutor observed that plaintiff's appearance was not consistent with the height and weight of the individual described in the criminal complaint. Nevertheless, the motion judge found that when Wilcox testified before the grand jury, he did not willfully withhold or misrepresent any information in his testimony. The motion judge further found that:
Certainly, it was tragically a mistake that the individual [plaintiff] who appeared at the first hearing ... in fact, had his identity pilfered by another individual, another actor. That Mr. Brunson was a victim the same as the bank was but there is no showing that there was any conscious withholding of the information from the grand jury in an attempt to indict someone falsely; only,... an innocent mistake. And then that innocent mistake was resulting in Mr. Brunson's indictment. But one which was corrected.
There is no showing that Mr. Wilcox was negligently hired ... nor any showing that a cause of action for negligent prosecution exists in this State. That there will always be, unfortunately, some mistakes that can occur in any grand jury presentment. If that is the standard for... wrongful prosecution, that will have to be a rule created by a higher court than this one.
In this appeal, plaintiff argues that the trial court erred (1) in granting summary judgment when there were disputed issues of fact; (2) in finding that the grand jury indictment precluded a claim for malicious prosecution; (3) in failing to consider all of the facts and issues; (4) in finding that plaintiff must be present to pursue his claim at trial; and (5) in failing to grant plaintiff's cross-motion for summary judgment.

I
We first address plaintiff's malicious prosecution claims.
It has generally been stated that malicious prosecution is not a favored cause of action because citizens should not be inhibited in instituting prosecution of those reasonably suspected of crime. On the other hand, one who recklessly institutes criminal proceedings without any reasonable basis should be responsible for such irresponsible action. Development of the malicious prosecution *555 cause of action as we know it today is the result of a balancing of these antithetical considerations.
[Lind v. Schmid, 67 N.J. 255, 262, 337 A.2d 365 (1975) (internal citations omitted) (emphasis added).]
In a civil claim for malicious prosecution arising out of a criminal prosecution, the plaintiff must prove by a preponderance of the evidence:
(1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff. Prosser, Law of Torts, § 119 at 835 (4th ed.1971); Evans v. Jersey Central Power Co., 119 N.J.L. 88, 194 A. 144 (E. & A. 1937). The plaintiff must establish each element. Upon failure to prove any one, the cause must fail. Each element is separable from the others, although evidence of one may be relevant with respect to another. For example, proof of lack of probable cause may be appropriate evidence from which to infer but not necessarily establish malice.
[Ibid.]
Defendants cite the Model Civil Jury Charge 3.12 which articulates the elements for malicious prosecution based upon a prior criminal proceeding:
First. The plaintiff must establish the existence of a criminal judicial proceeding against him/her. On this subject the (undisputed) facts are (state the nature of the criminal charge instituted against the plaintiff, the name of the judicial tribunal in which it was instituted, etc.)
Second. The plaintiff must establish that the defendant was responsible for or caused that proceeding to be instituted against him/her.
....
Third. The plaintiff must establish that the criminal proceeding terminated favorably to him/her or in a manner not adverse to him/her.
....
Fourth. The plaintiff must establish a lack of reasonable or probable cause for the criminal prosecution.
....
Fifth. The plaintiff must establish that the defendant was activated by a malicious motive in prosecuting the criminal complaint against him/her.
The malice contemplated by this element is not malice in the sense that the word is sometimes used. The kind of malice I speak of means the intentional doing of a wrongful or unlawful act without just cause or excuse. Such malice is an intentional act which an ordinarily cautious man would realize that under ordinary circumstances damage would result to one's person or property, and which does in fact damage another's person or property. The element of malice may be inferred from a lack of reasonable or probable cause.

Sixth. The last element that must be proved is that the plaintiff suffered damage, as I shall later define that term, as a proximate result of a malicious prosecution.
[Emphasis added.]
"Probable cause has been defined as a reasonable ground of suspicion, supported by circumstances sufficient to warrant an ordinarily prudent man [or woman] in believing the party is guilty of the offense. It must be more than mere conjecture or unfounded suspicion." Galafaro v. Kuenstler, 53 N.J.Super. 379, 384-85, 147 A.2d 550 (App.Div.1958) (emphasis *556 added). When the facts involving probable cause are not in dispute, it is a question of law for the court. Shoemaker v. Shoemaker, 11 N.J.Super. 471, 475, 78 A.2d 605 (App.Div.1951). Where there are factual disputes, however, probable cause is a fact question for the jury. Ibid.
Malice may be established "from the inference arising out of proof of lack of probable cause." Galafaro, supra, 53 N.J.Super. at 386, 147 A.2d 550. "The plaintiff must demonstrate that at the time when the defendant put the proceedings in motion the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed." Lind, supra, 67 N.J. at 263, 337 A.2d 365 (emphasis added). Such malice is an intentional act which an ordinarily cautious person would realize that under ordinary circumstances damage would result to one's person or property. Brennan v. United Hatters, 73 N.J.L. 729, 744-45, 65 A. 165 (E. & A. 1906).
Defendants maintain that "at the time the complaint was signed (without the benefit of any hindsight), there was clearly sufficient probable cause." The question, however, is not whether defendants benefited from hindsight, but whether they exercised reasonable foresight. Wilcox was a trained, certified fraud investigator. He had clear surveillance photos of the individual who opened the account and a description of him being 5 feet 6 inches. Yet, this trained fraud investigator never sought to compare the photos and description of the individual who perpetrated the fraud with plaintiff's photo and description, which were readily available to him. Indeed, Wilcox acknowledged that this was the first time in his professional career that he signed an indictable complaint without first viewing a photo array.
Moreover, common sense indicates that the individual who opened the account and cashed the fraudulent checks was not plaintiff  unless one assumes that a person intent on committing a fraud does so using his own name, address and social security number. The misspelling of "Patterson" was another strong indicator that the identification card was fraudulent and the individual who opened the account was not plaintiff. Nevertheless, Wilcox proceeded to sign the criminal complaints and then testify before the grand jury without any more information than that provided by Viva that Howard D. Brunson was not an employee and not authorized to sign checks.
Wilcox claims in his certification that he did not initiate the criminal prosecution  notwithstanding that it was he who signed the criminal complaints. He blames the police, claiming that it was their job "to investigate the identity of the person who committed the fraud." But, it was Wilcox  the trained and certified fraud investigator  who identified plaintiff as the perpetrator without conducting a reasonable investigation. In our view, Wilcox had a questionable basis for probable cause, at best. A jury may well conclude that "at the time when [Wilcox] put the proceedings in motion [by signing the criminal complaints] the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed." Lind, supra, 67 N.J. at 263, 337 A.2d 365.
Malice and probable cause are intertwined in a malicious prosecution action. As the Court noted in Lind, "one who recklessly institutes criminal proceedings without any reasonable basis" may be found to have acted with malice. 67 N.J. at 262, 337 A.2d 365 (emphasis added). The current jury charge defines "malice" as "the intentional doing of a wrongful or unlawful act without just *557 cause or excuse." Model Civil Jury Charge 3.12. Here, Wilcox acted intentionally in signing the criminal complaints and testifying before the grand jury. It is for a jury to decide whether he had "just cause or excuse" to do so, solely on the basis of Viva's letter stating that plaintiff was not authorized to sign checks for the company. The fact that Wilcox had plaintiff's name, address and social security number from the perpetrator of the fraud, cannot be considered probable cause under the circumstances here. The fact that the police told Wilcox plaintiff had a criminal record does not excuse his failure to request plaintiff's photo and description, and present them to the Affinity employees who dealt with the perpetrator first-hand. Again, it is for a jury to determine whether Wilcox acted reasonably or recklessly under all of the circumstances.
The trial court found that when Wilcox testified before the grand jury he did not willfully withhold or misrepresent information. Malice as it pertains to this cause of action, however, goes beyond willfully withholding or misrepresenting information. It goes to whether Wilcox acted reasonably under all of the circumstances.
Moreover, the fact that the indictment resulted from Wilcox's grand jury testimony does not necessarily demonstrate probable cause. The grand jury acted on the information presented to it. The reasonableness of Wilcox's investigation was not the issue before the grand jury. Indeed, if the grand jury had been presented with the disparity in the descriptions of the perpetrator and plaintiff and the surveillance photos along with photos of plaintiff, it may well have rejected the allegations and voted No Bill of indictment.
In Galafaro, the plaintiff caught the defendant's son breaking into a house the plaintiff was building. 53 N.J.Super. at 383, 147 A.2d 550. The boy admitted taking items from the construction site and the plaintiff called the police. Ibid. The police took the boy home and, in his mother's presence, he admitted stealing articles from the plaintiff's construction site. Ibid. The boy's mother, filed a criminal complaint against the plaintiff for atrocious assault. Id. at 384, 147 A.2d 550. When all of the evidence was presented to the grand jury, it voted No Bill of indictment. Ibid. In the plaintiff's malicious prosecution suit, we noted that "[a]lthough the grand jury's action is not conclusive, it is evidence of a favorable termination of the criminal proceedings and is to be considered along with the other evidence in the case." Id. at 386, 147 A.2d 550. Defendant here argues conversely that the indictment in this case "constitutes prima facie evidence that probable or reasonable cause exists  absent a showing of fraud or perjury."
In Helmy v. Jersey City, 178 N.J. 183, 836 A.2d 802 (2003), the New Jersey Supreme Court addressed this very point. There, after a traffic stop, the plaintiff was indicted on charges of aggravated assault, eluding, resisting arrest and terroristic threats. He was ultimately acquitted on all charges. Id. at 188, 836 A.2d 802. He then filed a civil complaint in which he alleged that after the traffic stop "he was physically assaulted before other officers, locked in a closet, taunted about his ethnicity, searched, forced to remove his clothing while handcuffed to a bench, generally ridiculed, and denied medical attention." Id. at 187, 836 A.2d 802. In his complaint, the plaintiff pleaded federal civil rights claims, state statutory and common law claims  including malicious prosecution. Ibid.
At the close of the civil trial, the defendants moved for a directed verdict. Id. at 188, 836 A.2d 802. The motion was granted with respect to all claims except excessive *558 force, conspiracy, false arrest, and malicious prosecution. Ibid. The jury was charged on the remaining claims but the court submitted a special interrogatory to the jury asking: "Do you find that [the][o]fficer requested the documents for the van that [Helmy] was driving when he was initially stopped at 201 St. Paulo's Avenue?" Id. at 189, 836 A.2d 802. The jury was instructed to answer the interrogatory first, apparently on the assumption that the answer would resolve the false arrest claim. Ibid. When the jury responded affirmatively, the court granted the defendant's motion for a directed verdict on the false arrest charge. Ibid. The jury later found in favor of the plaintiff on the malicious prosecution claim. Ibid. The trial court then granted the defendants' motion for judgment notwithstanding the verdict (JNOV) because a finding of malicious prosecution "requires a finding that there was an absence of probable cause and clearly the facts in this case establish [probable] cause." Id. at 189-90, 836 A.2d 802.
The plaintiff appealed and the Supreme Court reversed, holding that "[a]lthough a grand jury indictment is prima facie evidence of probable cause to prosecute, when the facts underlying it are disputed, the issue must be resolved by the jury." Id. at 191, 836 A.2d 802. The Court noted that the plaintiff had been acquitted of the criminal charges in the indictment and "den[ied] outright that he committed any of the acts for which he was indicted except driving away from the first encounter. If the jury believed his version it was fully empowered to render a verdict on the issue." Id. at 192, 836 A.2d 802.
As we discussed above, the grand jury indicted plaintiff on the basis of Wilcox's testimony. Clearly, the facts underlying that testimony are in dispute. The question for the fact finder in this case is not whether Wilcox committed fraud or perjury before the grand jury, but whether the grand jury would have indicted plaintiff if it had been presented with photographs of the imposter and plaintiff, along with the disparity in their descriptions.
Helmy, and its predecessor, Zalewski v. Gallagher, 150 N.J.Super. 360, 367, 375 A.2d 1195 (App.Div.1977), involved law enforcement officers who allegedly falsely imprisoned and maliciously prosecuted the plaintiffs, and lied before the grand juries to secure indictments. Here, there is no allegation that Wilcox lied before the grand jury. Rather, plaintiff alleges that Wilcox  a trained, certified fraud investigator  negligently investigated the matter, recklessly signed the criminal complaints and testified before the grand jury without probable cause to pursue the charges against the real Howard Brunson. As a trained, certified fraud investigator, Wilcox "put the proceedings in motion [when] the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed." Lind, supra, 67 N.J. at 263, 337 A.2d 365.
Wilcox was employed by Affinity as a fraud investigator. In investigating and prosecuting plaintiff, he was apparently acting within the scope of his employment. Consequently, Affinity may be vicariously liable for Wilcox's conduct.
In Hill v. New Jersey Dep't of Corr. Comm'r Fauver, 342 N.J.Super. 273, 305-06, 776 A.2d 828 (App.Div.2001), certif. denied, 171 N.J. 338, 793 A.2d 717 (2002), this court stated that
[i]n considering whether an employer is vicariously liable for the acts of its employees or agents, the fact that the tort is negligent or intentional is of no real consequence. Schultz v. Roman Catholic Archdiocese of Newark, 95 N.J. 530, 535, n. 1, 472 A.2d 531 (1984). Under *559 the doctrine of respondeat superior, an employer will be held liable to a third party even for the intentional torts of one of its employees if that employee was acting within the scope of his or her employment. Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 416, 650 A.2d 958 (1994); Lehmann v. Toys `R' Us, 132 N.J. 587, 619, 626 A.2d 445 (1993). An employee is acting within the scope of employment if the action is, of the kind [that the servant] is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated at least in part, by a purpose to serve the master. Abbamont, supra, 138 N.J. at 416, 650 A.2d 958, (citing DiCosala v. Kay, 91 N.J. 159, 169, 450 A.2d 508 (1982) (internal citations omitted)). Thus, the doctrine of respondeat superior is not limited to negligent torts. An employer may be held liable for the intentional torts of his servant when they are "reasonably connected with the employment and so within its `scope.'" Abbamont, supra, 138 N.J. at 419, 650 A.2d 958 (citing W. Prosser, et al., Cases and Materials Torts, 685 (7th ed.1982)).
Accordingly, we reverse the grant of summary judgment in favor of Wilcox and Affinity on the malicious prosecution claim.

II
With respect to plaintiff's negligence claim, defendants contend that there is no cause of action for negligent prosecution. Defendants liken negligent prosecution to "negligent defamation" or "negligent imprisonment," which are non-existent causes of action because false imprisonment and defamation are intentional torts. Plaintiff did not plead "negligent prosecution," however. Rather, he alleged that "Wilcox, representing himself to be a Loss Prevention Specialist, was so negligent, careless and reckless to have personally signed a criminal complaint ... as to cause and create a hazardous condition and unreasonable risk of harm to the person, resulting in serious injury as described herein to plaintiff." In other words, plaintiff alleged that filing the criminal complaints without undertaking a reasonable investigation amounted to negligence. While this may be a novel presentation of facts in a negligence claim, legally it does not differ from any other negligence claim.
Before undertaking a legal analysis of plaintiff's negligence claims, however, we must first put the issue in perspective. We cannot overlook the rapidly growing concern with identity theft both nationally and in New Jersey. The Federal Trade Commission (FTC) established the Consumer Sentinel Network (Sentinel), a secure online database to track the "millions of consumer fraud and identity theft complaints" reported each year. http://www.ftc. gov/sentinel. In 2005, the FTC reported a 32% increase in identity theft complaints nationally from 2003. Federal Trade Commission, Consumer Fraud and Identity Theft Complaint Data: January-December 2005 at 4 (Jan. 25, 2006). In its January-December 2007 Report, the FTC stated that its database "now contains over 4.3 million fraud and identity theft complaints." Federal Trade Commission, Consumer Fraud and Identity Theft Complaint Data: January-December 2007 at 3 (Feb. 13, 2008) (FTC 2007 Report). The FTC 2007 Report indicates that New Jersey ranks twelfth of the fifty states in reported identity theft cases with seventy-nine complaints per 100,000 population. Id. at 18, 793 A.2d 717.
With the growth of identity theft both nationally and in New Jersey, it is incumbent upon financial institutions and fraud investigators to pursue with reasonable care their responsibility for protecting, not *560 only their own customers, but non-customers who may be victims of identity theft. Fairness and public policy require financial institutions to be accountable when they negligently put individuals at risk by failing to exercise reasonable care in undertaking investigations of fraud claims.
Under New Jersey law, to maintain a negligence action, "a plaintiff must allege that the defendant had a duty of care which it breached, and that the breach proximately caused legally cognizable injury." De Milio v. Schrager, 285 N.J.Super. 183, 190, 666 A.2d 627 (Law Div.1995). "The concept of legal duty emanates from the responsibility each person bears to exercise due care to avoid unreasonable risk of harm to others," ibid., and the determination of its existence is generally a matter for a court to decide. Carvalho v. Toll Bros. Developers, 143 N.J. 565, 572, 675 A.2d 209 (1996).
The foreseeability of the harm "is a significant consideration in the determination of a duty to exercise reasonable care." Ibid. "The `ability to foresee injury to a potential plaintiff does not in itself establish the existence of a duty, but it is a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate.'" Id. at 572-73, 675 A.2d 209 (quoting Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 194, 638 A.2d 1288 (1994)) (citations omitted).
After establishing the foreseeability of an injury to a party, the court must consider fairness and public policy, which involves weighing several factors: "`the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" Carvalho, supra, 143 N.J. at 573, 675 A.2d 209 (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993)). "The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct." Hopkins, supra, 132 N.J. at 439, 625 A.2d 1110. "[C]ourts must consider the real-life consequences of imposing a duty and cannot be oblivious of the social realities of the day." Acuna v. Turkish, 192 N.J. 399, 414, 930 A.2d 416 (2007).
Here, we consider whether Affinity and Wilcox owed a duty of care to plaintiff, a non-customer, who was a victim of a fraud perpetrated on the bank by an imposter using plaintiff's name, address and social security number to cash fraudulent checks. Generally, a bank owes no duty of care to third parties who are not bank customers. Pennsylvania Nat'l Turf Club, Inc. v. Bank of W. Jersey, 158 N.J.Super. 196, 203, 385 A.2d 932 (App. Div.), certif. denied, 77 N.J. 506, 391 A.2d 520 (1978); accord Software Design & Application, Ltd. v. Hoefer & Arnett, Inc., 49 Cal.App.4th 472, 56 Cal.Rptr.2d 756, 760-63 (1996); Weil v. First Nat'l Bank of Castle Rock, 983 P.2d 812, 815 (Colo.Ct. App.1999); E.F. Hutton Mortgage Corp. v. Equitable Bank, 678 F.Supp. 567, 579 (D.Md.1988); McCallum v. Rizzo, 4 Mass. L. Rep. 397 (1995); Gesell v. First Nat'l City Bank, 24 A.D.2d 424, 260 N.Y.S.2d 581 (1965).
Our Supreme Court, however, has "recognized tort liability of a financial institution where a special relationship has been established from which a duty can be deemed to flow." City Check Cashing, Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 59-60, 764 A.2d 411 (2001) (citing Cumis Ins. Soc'y, Inc. v. Windsor Bank & Trust Co., 736 F.Supp. 1226, 1233 (D.Conn. 1990)) (noting that banks have a duty to disclose that some special relationship has *561 been established such as fiduciary, confidential, contractual or legal or where there was fraud or misrepresentation on the part of defendant bank). "Absent a special relationship, courts will typically bar claims of non-customers against banks." City Check Cashing, supra, 166 N.J. at 60, 764 A.2d 411. "[U]nless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty, the sole remedies available are those provided in the [Uniform Commercial] Code" for handling checks.[2]Id. at 62, 764 A.2d 411.
In Pennsylvania Nat'l Turf Club, numerous checks were written to the plaintiff, which were dishonored for insufficient funds. 158 N.J.Super. at 201, 385 A.2d 932. The plaintiff, a non-customer, sued the bank under a negligence theory for allowing a bank customer to overdraw his account by substantial margins causing the plaintiff significant financial damage. Ibid. We rejected that negligence theory and held that the bank owed no duty to the plaintiff giving rise to a negligence action. Ibid. We explained:
[A] fundamental requisite for tort liability is the existence of a duty owing from defendant to plaintiff. In the context of the record facts herein, the bank owed no general duty to Turf Club merely by way of warning or other notice, merely because the latter undertook to cash its depositor's checks, which turned out to be dishonored for insufficient funds. Beyond the duty relating to return of the instruments, the drawee bank herein had no duty arising out of a relationship to the holder of the checks which could ripen into tort liability. In the absence of evidence of any agreement, undertaking or contact between plaintiff and defendant from which any special duty can be derived, the improper handling of the [depositor's] account cannot in the abstract serve as a stepping stone for liability to plaintiff.
[Id. at 203, 385 A.2d 932 (citations omitted).]
The question of whether a bank has a duty of reasonable care to non-customers who have been victimized by imposters has not been addressed in New Jersey. Consequently, we look to other jurisdictions which have established that a bank owes a duty to non-customers to use reasonable care in opening checking accounts or extending credit. See Patrick v. Union State Bank, 681 So.2d 1364 (Ala.1996).
In Patrick, Bridgette Patrick had a temporary driver's license, without her photograph, and a department store credit card stolen from her wallet. 681 So.2d at 1365. Patrick reported to the department store that her credit card had been stolen, and she subsequently received her permanent driver's license in the mail. Ibid. A few weeks later, an imposter, identifying herself as "Bridgette Patrick" and using Patrick's temporary driver's license as identification, opened a checking account at a Union State Bank (Union State) branch. Ibid.
The Union State employee who opened the account testified
that she noticed that the imposter did not completely sign her last name on the account signature card; that she noticed that the signature on the card was different from the signature on Patrick's temporary driver's license; that she did not ask the imposter to verify the Social Security number by presenting a Social Security card; and that she did not attempt *562 to verify either of the telephone numbers given to her by the imposter.
[Ibid.]
The Union State employee did check the computerized banking information system to verify that "Bridgette Patrick" had banking history. Ibid. Shortly after the account was opened, the imposter wrote a number of insufficient fund checks on the account totaling approximately $1,500. Ibid.
Over the next two years, the real Bridgette Patrick was arrested at least four times on warrants related to the identity theft, spent approximately 10 nights in jail, followed by numerous court appearances. Id. at 1366. She went to great lengths to clear her name. Ibid. After clearing her name and having all charges against her dismissed, Patrick brought a negligence action against Union State for its failure to demand proper identification from the imposter and to verify the information which had been used to open the account. Ibid. The trial court granted the bank's motion for summary judgment, holding that Patrick had failed to present evidence to support a favorable finding on the issues of duty and proximate cause. Ibid.
On appeal, the Alabama Supreme Court reversed, holding that "a bank owes a duty of reasonable care to the person in whose name, and upon whose identification, an account is opened to ensure that the person opening the account and to whom checks are given is not an imposter." Id. at 1371. The bank argued that, absent a special relationship, it had no duty to protect a member of the general public from a third party who fraudulently opened a checking account as an imposter. Id. at 1367. The Alabama Court rejected that argument, grounding its decision in traditional principles relating to the question of duty. Id. at 1368. The Court explained that the key factor in determining a duty is whether the injury was foreseeable by the defendant. Id. at 1368-69. The Court stated that "`the nature of defendant's activity; ... the relationship between the parties; and ... the type of injury or harm threatened'" were also considerations in determining the existence of a duty. Id. at 1369 (quoting Morgan v. South Central Bell Tel. Co., 466 So.2d 107, 114 (Ala.1985)).
In determining that Union State owed a duty to Patrick, the Alabama Court also relied upon the special status of banks in our society:
"Banks stand in the intimate relation of a fiduciary to those who are their customers, depositors, stockholders, and associate banks, as well as the public generally, whose members are affected by their operation. Ordinary corporations handle their own money, but banks handle the money of other individuals. They are quasi-public corporations by nature, subject to regulation and supervision by the state."
[Ibid. (quoting Security Trust & Savings Bank v. Marion County Banking Co., 287 Ala. 507, 253 So.2d 17, 21 (1971)).]
The Court noted that the Security Trust and Savings Bank case "illustrat[ed] the importance of, and the public trust placed in, the banking industry." Ibid.
The Court disagreed with the bank's argument that it had "absolutely no relationship" with Patrick:
The bank undeniably thought that it had a relationship with Ms. Patrick when it opened the account for, and gave checks to, an imposter; and the fact that the bank opened a checking account under the name "Bridgette Lawshawn Partrick," under Ms. Patrick's [s]ocial [s]ecurity number, and based solely upon the presentation of Ms. Patrick's temporary *563 driver's license as identification, persuades us that there is some relationship between the parties. The fact that the relationship defies common categorization does not mean that there is no relationship.
[Ibid.]
The Court continued its analysis with the question of whether the type of injury or harm threatened is one for which tort liability is appropriate, and concluded that the fraudulent check cashing scheme, and the injury and harm it caused the plaintiff, were foreseeable to the extent that a duty should be imposed. Id. at 1369. It explained that "[t]he issuance of worthless checks [was] extremely likely to result from opening a checking account for, and giving checks to, an imposter." Ibid. Moreover, the arrest and incarceration of the person whose name and social security number were used to open the fraudulent account "are probable consequences of the issuance of worthless checks." Ibid. The Court concluded that it was foreseeable "that the person in whose name and [s]ocial [s]ecurity number and upon whose identification a checking account is opened may be injured or harmed by fraud if the bank does not employ commercially reasonable means to verify that the person opening the account and to whom checks are given is not an imposter." Ibid. Additionally, the court found that the bank was in the best position to prevent the harm to the plaintiff. Ibid.
Noting the foreseeability of the fraud, the relationship Union State believed existed between itself and Patrick and the consequences of its failure to confirm identification, the Alabama Court held that Union State had a duty to verify its customers' identities. Id. at 1369-71.
The facts here are very similar to those in Patrick, wherein an identity theft victim was wrongly accused of check kiting and spent numerous nights in jail as a result. There, the court found that "[t]he bank undeniably thought it had a relationship with Ms. Patrick when it opened the account for and gave checks to, an imposter." Patrick, supra, 681 So.2d at 1369. The Court was persuaded that there was some relationship between the parties by "the fact that the bank opened a checking account under the name `Bridgette Lashawn Patrick,' under Ms. Patrick's [s]ocial [s]ecurity number, and based solely upon the presentation of Ms. Patrick's temporary driver's license as identification." Ibid.
As did the bank in Patrick, Affinity established a relationship with plaintiff when it opened the account in his name with his address, date of birth and social security number. The injury to plaintiff was foreseeable: the identity theft, the fraudulent scheme and the resulting injury and the harm it caused plaintiff were foreseeable. The depositing and cashing of worthless checks would be a likely result of an imposter opening a checking account. "[W]hy else would a person open a checking account in another's name when the person has no relationship with the other?" Patrick, 681 So.2d at 1369. Arrest and incarceration of the person whose name, social security number, date of birth and address were used to open such an account were probable consequences of cashing the fraudulent checks. Ibid.
We need not go as far as the Patrick court, which held that the bank could be held liable for the negligent opening of accounts. Here, we do no more than hold that Affinity and Wilcox may be held liable for initiating the criminal complaints against plaintiff based upon the negligent investigation of the fraud perpetrated on the bank by the imposter.
With the growing threat of identity theft, every individual is at risk for having *564 an imposter undertake fraudulent activity using an individual's name, address, social security number or other private information. Financial institutions  particularly banks  have a duty to exercise reasonable care in opening accounts. The duty of care extends to investigating fraud and pursuing allegedly fraudulent claims. Here, Affinity, through its employee Wilcox  a certified fraud investigator  pursued plaintiff in the face of numerous indicators that he was not the perpetrator of the fraud. Wilcox had the opportunity to obtain a photo and physical description of plaintiff, which he could have shown to Affinity's employees who interacted with the imposter. He did not do so. He could have shown the bank's surveillance photos to the police. He did not do so. He could have compared the perpetrator's description with plaintiff's. He did not do so. Nevertheless, he signed two criminal complaints and testified before the grand jury based upon very limited information and the illogical premise that plaintiff opened the account in his own name, using his own address and social security number  in order to perpetrate a fraud.
In our view, Affinity and Wilcox had a duty of care to plaintiff. That duty included the duty to conduct a reasonable investigation before initiating criminal proceedings against the person whose stolen identity was used to open the account. The injury to plaintiff was foreseeable; a jury may well find that defendants breached their duty of care and that breach proximately caused plaintiff's injury.

III
We briefly address plaintiff's argument that he need not be present to pursue his claim because he is currently incarcerated out of state on unrelated charges. Clearly, the trial court erred stating that plaintiff had to be present for trial. As long as the proofs can be presented in accordance with the rules of evidence, plaintiff need not be present for trial.
Accordingly, we reverse the grant of summary judgment in favor of Affinity and Wilcox on the negligence claims and remand for further proceedings.
Reversed and remanded.
NOTES
[1] Although the individual who opened the account used a non-driver's license identification, the criminal complaint against plaintiff bears plaintiff's driver's license number.
[2] The Uniform Commercial Code (UCC) does not apply here because plaintiff was not a customer of the credit union and did not draw checks or cash them in the credit union. N.J.S.A. 12A:4-104 and -402.