972 A.2d 1112

HOWARD D. BRUNSON, PLAINTIFF–RESPONDENT, v. AFFINITY FEDERAL CREDIT UNION, A CORPORATION, DOING BUSINESS IN THE STATE OF NEW JERSEY AND JIM WILCOX, INDIVIDUALLY AND AS AGENT/EMPLOYEE OF AFFINITY FEDERAL CREDIT UNION, DEFENDANTS–APPELLANTS.

Argued March 10, 2009—Decided May 5, 2009.

382

384

*David J. Dering* argued the cause for appellants (*Leary, Bride, Tinker & Moran,* attorneys; *Mark Bongiovanni,* of counsel; *Mr. Dering, Mr. Bongiovanni,* and *Peter M. Bouton,* on the brief).

*Anthony J. Cariddi* argued the cause for respondent (*Cariddi and Garcia,* attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

An apparent case of identity theft blossomed into criminal charges, an indictment, an arrest, and the thirteen-day incarceration of the wrong person. Those events triggered the malicious prosecution action now on appeal, which raises three discrete questions. First, does a claim of malicious prosecution lie in the circumstances presented? Second, is there a cause of action for negligent investigation? And, third, does the plaintiff's failure to appear for trial, after a notice in lieu of a subpoena commanding his presence has been properly issued and served, constitute sufficient cause to dismiss his complaint?

We conclude that, because the plaintiff's arrest and detention were based on probable cause, his claim for malicious prosecution properly was dismissed by the trial court. We also conclude that, in the circumstances presented, New Jersey does not recognize a cause of action for negligent investigation as a surrogate for a malicious prosecution claim. Finally, we hold that, when confronted with a plaintiff who fails to appear as a witness, trial courts first must explore less drastic remedies before invoking the ultimate sanction of dismissal.

I.

On October 7, 2002, a person purporting to be Howard D. Brunson applied to open a savings account at the Paramus branch of defendant Affinity Federal Credit Union (Affinity). As proof of his identity, he presented to the teller a New Jersey State Motor Vehicle Services identification card bearing a unique identification number akin to a driver's license number, clearly marked "For

Identification Only," that bore his photograph, identified him as "Howard D. Brunson of 456 11th Avenue, Patterson,[1] New Jersey 07504," with a date of birth of August 31, 1967, and described him as a male with brown eyes who was five feet six inches tall. As part of the account opening process, he also provided a Social Security number to the teller. Once the account was opened, he deposited twenty-five dollars and left.

The next day, October 8, 2002, that person returned to Affinity's Paramus branch and deposited into the same account what appeared to be a payroll check, in the amount of $1,522.91, made payable to "Howard D. Brunson" at the address listed on the account. Consistent with Affinity's policy to give immediate credit for payroll checks issued by certain employers,[2] he was allowed to withdraw immediately the entire deposit in cash. Later that same day, he went to the Morristown branch of Affinity, deposited another payroll check purportedly issued by the same employer in the amount of $1,598.24 and, again, immediately withdrew that sum in cash. Thus, on October 8, 2002, he deposited two different payroll checks from the same alleged employer at two different branches of Affinity, and withdrew an aggregate of $3,121.15.

The following day, October 9, 2002, the same person went to Affinity's Dover branch and repeated what he twice had done the day before: he deposited what purported to be a payroll check from the same identified employer, in the amount of $1,436.95, and again immediately withdrew that amount in full and in cash. An hour later, he went to Affinity's Denville branch and again reprised his steps: he deposited what purported to be a payroll check from what appeared to be the same employer, in the amount

---

[1] The State-issued Motor Vehicles Services I.D. Card misspelled Paterson as "Patterson."

[2] As later explained in the testimony before the grand jury, Affinity has certain designated "select employment groups." Because the employer listed on the deposited check had been designated by Affinity as "a select employment group," it was to receive "preferential treatment," which includes that "their checks deposited by their employees would be instant credit."

of $1,675.24, only to withdraw immediately that amount in cash. Thirty minutes later, he repeated those actions at the Cedar Knolls branch of Affinity, only this time the amount of the claimed payroll check deposited and immediately withdrawn was identical to the second transaction that day: $1,675.24. In sum, on October 9, 2002, he deposited three different payroll checks from the same alleged employer at three different branches of Affinity, withdrawing an aggregate of $4,787.43. Finally, on October 10, 2002, he retraced his steps once more, this time at Affinity's Warren branch, where he deposited an alleged payroll check and immediately withdrew the sum of $1,598.24.

In the aggregate, then, over a three day period, he deposited and immediately withdrew six separate, seemingly valid payroll checks totaling $9,506.82. Once those purported payroll checks were processed through the central banking system, they were returned unpaid to Affinity, marked "Unable to Locate Account." Further inquiry made of the employer listed on the checks and the bank on which those checks purportedly were issued determined that the checks were counterfeit and had been drawn on a fictitious account.

Confronted with this loss, Affinity instructed its employee, defendant Jim Wilcox, a certified fraud examiner, to conduct an investigation. Wilcox collected the above information, prepared a written report, and presented it to the Paramus Police Department, the municipality where the account was opened. Wilcox was informed by the police that a Dwayne Brunson of Bronx, New York, was known to use the same name—Howard D. Brunson—and Social Security number used in opening the Affinity account to defraud a number of other financial institutions. In a written report, Wilcox noted that "[p]hoto line-ups will be required in all other counties [3] [ and that the] Denville Detective Bureau is in the process of getting a photo from New York to use in a line-up for [Affinity's] personnel." In January 2003, that investigation result-

---

[3] *See* footnote 5, *infra.*

ed in the issuance of two criminal complaints against "Howard D. Brunson, LKA [4] 456 11th Avenue, Paterson, NJ."

On March 26, 2003, the matter was presented to the Bergen County grand jury. Wilcox was the sole witness called. In response to questions from the assistant prosecutor, he testified that, in respect of "the matter of Dwayne Brunson, also known as Howard Brunson[,]" he was "familiar with [the] investigation [.]" He explained that he was employed by Affinity and that he had been investigating bank fraud for twenty-five years. After explaining the process by which Affinity had been defrauded and the investigative steps he had undertaken, the following exchange ensued:

Q. And also a criminal history was run on the name of Howard Brunson, also known as Dwayne Brunson, using ... the Social Security number that he provided to the bank and that Social Security number also comes back to Dwayne Brunson, also known as Howard Brunson?

A. That is correct.

Q. Correct?

A. Yes.

Q. Okay. And to your knowledge, Mr. Brunson has not been arrested on this charge?

A. No, he hasn't.

Wilcox was excused and, after deliberation, the grand jury returned a three-count indictment charging "Dwayne Brunson, a/k/a Howard Brunson" with third-degree issuing a bad check, in violation of *N.J.S.A.* 2C:21–5(a); third-degree forgery, in violation of *N.J.S.A.* 2C:21–1(a)(3); and third-degree theft by deception, in violation of *N.J.S.A.* 2C:20–4.[5] Because the person indicted failed to appear at the arraignment, a bench warrant authorizing the

---

[4] Meaning "last known address."

[5] The Bergen County grand jury only considered the first counterfeit check: the one deposited at the Paramus branch of Affinity, where the account originally was opened. The remaining five counterfeit checks were negotiated either in Morris County (in chronological order, the Morristown, Denville, Dover and Cedar Knolls branches) or in Somerset County (the Warren branch).

arrest of "Dwayne Brunson, a/k/a Howard Brunson" was issued on May 19, 2003.

On June 15, 2003, plaintiff Howard Dwayne Brunson was visiting his father in the Commonwealth of Virginia for Father's Day. While traveling as a passenger in a car driven by his father and in the company of three of his own children, the car was stopped for a motor vehicle infraction. As the only other adult in the car, the Virginia authorities requested that plaintiff identify himself and conducted a computer search of plaintiff's date of birth and Social Security number. That search revealed that a bench warrant had issued for a person matching plaintiff's name, birth date and Social Security number. Based on that match and under the authority of the pending bench warrant, plaintiff was arrested. He waived extradition and was transported to Bergen County. Once there, plaintiff retained counsel, who asserted that the wrong man had been arrested.

The day after plaintiff was transported to Bergen County, on June 27, 2003, and at the urging of plaintiff's counsel, the State brought the matter to the attention of the trial court. The State moved to dismiss the bench warrant and to release plaintiff from the Bergen County jail, explaining that it would have to "reindict this case as John Doe using the name Dwayne Howard." Noting that neither the physical description nor surveillance still photographs of the thief matched the person before him—the thief's identification described him as being five feet six inches tall, while plaintiff is six feet three inches tall, and the bank surveillance photographs did not match the person then present before the court—the trial court concluded that "it's the wrong individual" and ordered plaintiff's release from custody.[6] In total, plaintiff was incarcerated for thirteen days on the bench warrant.

---

[6] On July 24, 2003, upon the State's application, the trial court entered an order dismissing the indictment and canceling any bench warrants issued thereunder.

On June 27, 2005, plaintiff filed a four-count complaint against Affinity and Wilcox, as well as a fictitious entity and a fictitious individual. He claimed that all defendants were liable to him for malicious prosecution (count one); Wilcox was liable to plaintiff in negligence (count two); Affinity was liable to plaintiff for the negligent hiring of Wilcox (count three); and (4) the individual fictitious defendant was liable to plaintiff in negligence (count four).

Affinity and Wilcox eventually moved for entry of summary judgment in their favor. They also moved to dismiss the complaint because plaintiff had failed to appear for a deposition or in response to a notice in lieu of subpoena.[7] Over plaintiff's objection, the trial court granted both motions. Addressing the summary judgment motion, the trial court found

> that there was a good faith effort in terms of the [grand jury] presentation here. Certainly, it was tragically a mistake that the individual who appeared at the first hearing was—in fact, had his identity pilfered by another individual, another actor. That Mr. Brunson was a victim the same as the bank was[,] but there is no showing that there was any conscious withholding of the information from the grand jury in an attempt to indict someone falsely; only, again, a—an innocent mistake. And then that innocent mistake was resulting in Mr. Brunson's indictment. But one which was corrected.
>
> There is no showing that Mr. Wilcox was negligently hired or that there—at all and—nor any showing that a cause of action for negligent prosecution exists in the State.
>
> [T]here will always be, unfortunately, some mistakes that can occur in any grand jury presentment. If that [alone] is the standard for now wrongful prosecution, that will have to be a rule created by a higher court than this one.

It summed up its reasoning as follows: "the Court finds that there was no willful or reckless presentation of evidence in order to falsely indict Mr. Brunson."

The trial court then turned to Affinity's and Wilcox's motion to dismiss the complaint due to the failure to produce plaintiff for

---

[7] See R. 1:9–1 ("The testimony of a party who could be subpoenaed may be compelled by a notice in lieu of subpoena served upon the party's attorney demanding that the attorney produced the client at trial.... The sanctions of R. 1:2–4 shall apply to a failure to respond to a notice in lieu of a subpoena.").

trial. Specifically, Affinity and Wilcox explained that plaintiff was incarcerated in a federal prison in Oklahoma, where he was—and apparently remains—serving a twelve-year sentence. They claimed that, as defendants in a civil action, they are entitled to be confronted by plaintiff's proofs and to have plaintiff present at trial. In response, plaintiff, through his counsel, asserted that the material facts were not in dispute and that, in any event, he was powerless to compel the United States Bureau of Prisons to transport plaintiff to New Jersey so he could attend this civil trial. The trial court's ruling was terse: "I do find that the failure to produce the [p]laintiff or even showing that [plaintiff's counsel] tried and could not do so is a ground[ ] for the dismissal of the case[.]"[8]

Plaintiff appealed, and the Appellate Division reversed and remanded. *Brunson v. Affinity Fed. Credit Union,* 402 *N.J.Super.* 430, 954 *A.*2d 550 (App.Div.2008). In respect of plaintiff's malicious prosecution claim, the panel asserted that "[t]he question for the fact finder in this case is not whether Wilcox committed fraud or perjury before the grand jury, but whether the grand jury would have indicted plaintiff if it had been presented with photographs of the imposter and plaintiff, along with the disparity in their descriptions." *Id.* at 443, 954 *A.*2d 550. As viewed by the Appellate Division, "plaintiff alleges that Wilcox—a trained, certified fraud investigator—negligently investigated the matter, recklessly signed the criminal complaints and testified before the grand jury without probable cause to pursue the charges against the real Howard Brunson." *Id.* at 444, 954 *A.*2d 550. It concluded that, "[a]s a trained, certified fraud investigator, Wilcox 'put the proceedings in motion [when] the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed.'" *Ibid.* (quoting *Lind v. Schmid,* 67 *N.J.* 255, 263, 337 *A.*2d 365 (1975)).

---

[8] Plaintiff cross-moved for summary judgment; that cross-motion was denied.

Turning to plaintiff's negligence claim, the panel explained that "plaintiff alleged that filing the criminal complaints without undertaking a reasonable investigation amounted to negligence." *Id.* at 445, 954 *A.*2d 550. Conceding that "this may be a novel presentation of facts in a negligence claim," it nevertheless concluded that "legally it does not differ from any other negligence claim." *Ibid.* In this context, the Appellate Division recognized that "[t]he question of whether a bank has a duty of reasonable care to non-customers who have been victimized by imposters has not been addressed in New Jersey." *Id.* at 448, 954 *A.*2d 550. Conjuring the specter of the growing problem of identity theft and relying on but a single case from Alabama, *Patrick v. Union State Bank,* 681 *So.*2d 1364 (Ala.1996), the panel concluded that

> Affinity and Wilcox had a duty of care to plaintiff. That duty included the duty to conduct a reasonable investigation before initiating criminal proceedings against the person whose stolen identity was used to open the account. The injury to plaintiff was foreseeable; a jury may well find that defendants breached their duty of care and that breach proximately caused plaintiff's injury.
>
> [*Brunson, supra,* 402 *N.J.Super.* at 453, 954 *A.*2d 550.]

Finally, the panel "briefly address[ed] plaintiff's argument that he need not be present to pursue his claim because he is currently incarcerated out of state on unrelated charges." *Ibid.* It concluded that, "[c]learly, the trial court erred [in] stating that plaintiff had to be present for trial." *Ibid.* It reasoned, without discussion, that, "[a]s long as the proofs can be presented in accordance with the rules of evidence, plaintiff need not be present for trial." *Ibid.*

We granted Affinity's and Wilcox's joint petition for certification, 197 *N.J.* 258, 962 *A.*2d 529 (2008), and, for the reasons that follow, we reverse in part, and vacate in part the judgment of the Appellate Division, thereby reinstating the judgment of the trial court.

## II.

Affinity and Wilcox urge that the Appellate Division "exceeded [its] authority and created a *new* tort for [n]egligent [p]rosecu-

tion/[i]nvestigation which now threatens to supplant the tort of [m]alicious [p]rosecution and fundamentally subvert the delicate balance of public policy considerations that this Court has crafted in the heightened standards for a [m]alicious [p]rosecution claim." They assert that the panel created a " 'negligence back door' to evade the heightened requirements for a [m]alicious [p]rosecution claim[,]" thereby "essentially eliminat[ing] the tort of [m]alicious prosecution[.]" In their view, when weighed properly, the proofs presented to the grand jury constituted sufficient probable cause to defeat plaintiff's malicious prosecution claim. They also argue that, in light of the relevant policy considerations, a negligence cause of action cannot lie in these circumstances.

Relying exclusively on his submissions to the Appellate Division, plaintiff claims that the failure to take additional investigative steps at the grand jury stage—steps that might have disclosed that, despite the use of plaintiff's identity information, plaintiff was not the person who defrauded Affinity—vitiates the grand jury's probable cause finding. According to plaintiff, the trial court's findings in that respect are not supported by sufficient credible evidence and, hence, are not entitled to deference. Indeed, plaintiff asserts that, because the absence of probable cause here is so clear, his cross-motion for summary judgment should have been granted.

We address first whether the criminal complaints signed by Wilcox and the indictment returned by the Bergen County grand jury were supported by probable cause; if so, then plaintiff's action for malicious prosecution must perforce fail. We then address whether, in the circumstances presented, plaintiff can maintain a negligence cause of action. Finally, we consider whether, given plaintiff's failure to appear for trial due to his incarceration out-of-state, the proper remedy was dismissal of the complaint.

### III.

The elements of the cause of action for malicious prosecution are well-defined: "plaintiff must prove (1) that the criminal

action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff." *Helmy v. City of Jersey City*, 178 *N.J.* 183, 190, 836 *A.2d* 802 (2003) (citing *Lind v. Schmid*, 67 *N.J.* 255, 262, 337 *A.2d* 365 (1975); *JEM Marketing, LLC v. Cellular Telecomm. Indus. Ass'n*, 308 *N.J.Super.* 160, 172, 705 *A.2d* 798 (App.Div.1998)). *See also Campione v. Adamar of New Jersey, Inc.*, 155 *N.J.* 245, 268, 714 *A.2d* 299 (1998) (same); *Paterson Tallow Co. v. Royal Globe Ins. Co.*, 89 *N.J.* 24, 35, 444 *A.2d* 579 (1982) (same). It is beyond doubt that "[t]he plaintiff must establish each element[ and that, u]pon failure to prove any one, the cause must fail." *Lind, supra*, 67 *N.J.* at 262, 337 *A.2d* 365. Further, "[e]ach element is separable from the others, although evidence of one may be relevant with respect to another." *Ibid.* Not all of those elements are of equal weight. It is understood that "[t]he essence of the cause of action is lack of probable cause[.]" *Ibid.* Particularly, "[t]he plaintiff must establish a negative, namely, that probable cause did not exist." *Id.* at 263, 337 *A.2d* 365.

██ Although no doubt a recognized tort, "malicious prosecution is not a favored cause of action because citizens should not be inhibited in instituting prosecution of those reasonably suspected of crime." *Lind, supra*, 67 *N.J.* at 262, 337 *A.2d* 365. *See also Penwag Property Co. Inc. v. Landau*, 76 *N.J.* 595, 597–98, 388 *A.2d* 1265 (1978) ("Malicious prosecution . . . is not a favored cause of action because of the policy that people should not be inhibited in seeking redress in the courts."). "On the other hand, one who recklessly institutes criminal proceedings *without any reasonable basis* should be responsible for such irresponsible action." *Lind, supra*, 67 *N.J.* at 262, 337 *A.2d* 365 (emphasis supplied). That said, "[d]evelopment of the malicious prosecution cause of action as we know it today is the result of a balancing of these antithetical considerations." *Ibid.* More than fifty years ago, that careful balancing process was eloquently described as follows:

> [T]he law does not look with favor upon actions for malicious prosecution; it does not encourage them. The reason is embedded deeply in our jurisprudence. The courts must be freely accessible to the people. Extreme care must be exercised so as to avoid the creation of a reluctance on their part to seek redress for civil or criminal wrongs for fear of being subjected to a damage suit if the action results adversely.
>
> [*Mayflower Indus. v. Thor Corp.*, 15 *N.J.Super.* 139, 153, 83 *A.2d* 246 (Ch.Div. 1951), *appeal dismissed*, 20 *N.J.Super.* 39, 89 *A.2d* 277 (App.Div.), *aff'd*, 9 *N.J.* 605, 89 *A.2d* 242 (1952).]

It is through that prism—the precarious balance between encouraging the orderly resolution of disputes and preventing the abuses that may result therefrom—that a claim alleging malicious prosecution must be evaluated. With the policy considerations that inform a cause of action in malicious prosecution firmly in mind, we turn to the application of those elements to plaintiff's case.

There can be no question that plaintiff has pled and proven the first and fourth elements of a malicious prosecution claim: a criminal action admittedly was instituted against plaintiff, and that proceeding unequivocally terminated in his favor. The crux of this case lies in the middle two elements: whether the filing of the criminal case against plaintiff was actuated by malice, and whether there was an absence of probable cause for that filing. Based on the record before us, we answer both questions in the negative.

■ It has long been the law of New Jersey that "[t]o warrant a submission of a case of malicious prosecution to the jury it must appear that the prosecution complained of was actuated by malice[,]" *Kearney v. Mallon Suburban Motors*, 135 *N.J.L.* 457, 459, 52 *A.2d* 692 (E. & A.1947), and that "[m]alice in the law is the intentional doing of a wrongful act without just cause or excuse." *McFadden v. Lane*, 71 *N.J.L.* 624, 630, 60 *A.* 365 (E. & A.1905). Lacking any direct proof that Affinity or Wilcox intentionally filed a complaint against plaintiff "without just cause or excuse," plaintiff was required to invoke "the well-settled rule that malice may be inferred from want of probable cause." *Hammill v. Mack Int'l Motor Truck Corp.*, 104 *N.J.L.* 551, 552, 141 *A.* 775 (E. & A.1928). *See also Vance v. Erie Railway Co.*, 32 *N.J.L.* 334, 337 (Sup.Ct.

1867) ("The proof of malice need not be direct. It may be inferred by the jury, from the want of probable cause.").

That said, a plaintiff cannot simply point to the absence of probable cause as sufficient proof of the required element of malice. It has been well said that "it is not unreasonable to require that plaintiff, on a defendant's motion for summary judgment, produce at least some extrinsic evidence of malice." *Westhoff v. Kerr S.S. Co.,* 219 *N.J.Super.* 316, 324, 530 *A.2d* 352 (App.Div. 1987), *certif. denied,* 109 *N.J.* 503, 537 *A.2d* 1292 (1987). The rationale for that rule is simple: "Otherwise free access to the courts by citizens could be readily chilled by the harassment and cost of malicious use of process actions which would have to be sent to the jury." *Ibid.* For that reason, "[a] number of courts have interpreted the requirement for a showing of actual malice to include at least some extrinsic evidence of malice, rather than relying only upon inference." *Ibid.* (citations omitted). The question, then, is two-fold: whether Affinity and Wilcox had probable cause to institute criminal proceedings against plaintiff, and whether those acts were actuated by malice. Because the parties and the Appellate Division focused on whether plaintiff's prosecution was based on probable cause, it is to that question that we turn our focus.

Viewing the events solely in hindsight, plaintiff—and the Appellate Division—concluded that there were additional investigative steps Affinity and Wilcox could have taken that would have disclosed that the Howard Dwayne Brunson responsible for defrauding Affinity was not plaintiff. Plaintiff—and the Appellate Division—asserted that the simple expedient of securing a photograph of plaintiff and comparing that photograph with the images appearing on both the State-issued Motor Vehicle Services identification card and Affinity's own surveillance cameras would have sufficed to show that plaintiff was not the man who defrauded Affinity and, hence, there was no probable cause to support criminal charges against plaintiff. That reasoning, however, fails in two separate respects.

First, the trial court on summary judgment had before it both sets of photographs: one of plaintiff, in contrast with the photographs of the thief on the State-issued identification card and from the surveillance cameras. Comparing the two, it concluded, as a factual matter, that it could not "tell from these photographs that this is two different people or not or the same person." [9] In this context, it is a basic tenet of our jurisprudence that a trial court's factual findings "should not be disturbed if there is sufficient credible evidence in the record to support the findings." *State v. Adams,* 194 *N.J.* 186, 203, 943 *A.*2d 851 (2008). *See also State v. Chun,* 194 *N.J.* 54, 88–89, 943 *A.*2d 114 (2008) ("We will therefore limit our review of those findings and recommendations to a consideration of whether they are supported by sufficient credible evidence in the record[.]"); *State v. Arthur,* 184 *N.J.* 307, 320, 877 *A.*2d 1183 (2005) ("An appellate court must accept a trial court's factual finding if it is supported by sufficient credible evidence in the record."); *In re Taylor,* 158 *N.J.* 644, 656, 731 *A.*2d 35 (1999) (noting that "appellate court may not 'engage in an independent assessment of the evidence as if it were the court of first instance' " (quoting *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999))); *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974) (concluding that findings of fact made by trial judge "are considered binding on appeal when supported by adequate, substantial and credible evidence"). Because we are obliged to give deference to the factual conclusion reached by the trial court, plaintiff's claim that a mere comparison of photographs would have avoided plaintiff's arrest and detention, and thus demonstrated a want of probable cause sufficient to also demonstrate malice, must be rejected.

---

[9] Although the record on appeal contains several copies of the State-issued Motor Vehicle Services identification card and the surveillance photographs taken by Affinity, it does not contain any photographs of plaintiff. Therefore, even if it were appropriate for an appellate court to engage in a comparison, that exercise is hobbled by an incomplete record.

██ More importantly, we reject plaintiff's attempt to view the probable cause determination through the harsh and unforgiving glare of hindsight. In plaintiff's view, because additional steps could have been but were not taken and those steps might have forestalled plaintiff's incarceration on the bench warrant, the probable cause determination made then must be gauged by what we know now. That approach is not tethered to our law. It is clear that "*[i]nitially* the defendant must have had probable cause to set the action in motion." *Lind, supra,* 67 *N.J.* at 263, 337 *A.*2d 365 (emphasis supplied). *Lind* further explains that "[t]he plaintiff must demonstrate that at the time *when* the defendant put the proceedings in motion the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed." *Ibid.* (emphasis in original). Therefore, the question that must be asked is straightforward: "Was the state of facts such as to lead a person of ordinary prudence to believe on reasonable grounds the truth of the charge *at the time it was made?*" *Ibid.* (emphasis supplied).

██ We recently reiterated that

"The probable cause standard is a well-grounded suspicion that a crime has been or is being committed. Probable cause exists where the facts and circumstances within ... [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed. The substance of all the definitions of probable cause is a reasonable ground for belief of guilt."

[*State v. O'Neal,* 190 *N.J.* 601, 612, 921 *A.*2d 1079 (2007) (quoting *State v. Moore,* 181 *N.J.* 40, 45–46, 853 *A.*2d 903, (2004) (alterations in original) (citations and internal quotation marks omitted)).]

In the application of that standard, "[t]he totality of the circumstances must be considered in determining whether there is probable cause" and "the court must make a practical, common sense determination[.]" *Ibid.* (internal citations and quotation marks omitted).

Returning, as we must, to the point in time when Affinity and Wilcox presented their investigative findings to the Paramus Police Department and applying the probable cause standard to

the facts here adduced leads inexorably to the conclusion that the facts presented to law enforcement authorities by Wilcox on Affinity's behalf amply demonstrated the presence of probable cause. Wilcox's investigation adequately explained how certain crimes had been committed against Affinity. That investigation also identified who committed those crimes: it reasonably pointed to the thief's identity by the use of the State-issued identification card which, save for a common misspelling, bore no indicia of being counterfeit, along with corroborative surveillance photographs. Wilcox, on behalf of Affinity, presented the aggregate of that information to law enforcement; it was the police who prepared the criminal complaint,[10] and later caused it to be presented to the County Prosecutor's office.[11] The County Prosecutor then made a separate, independent determination of whether to submit the case to the grand jury and, if so, what witnesses would be called before it.

There is nothing in these facts, either singly or in total, that intimates—much less demonstrates—the type of abuse of our judicial processes the tort of malicious prosecution is designed to curb. On the contrary, Affinity's and Wilcox's actions, although ultimately erroneously directed at plaintiff, were based on probable cause, the type of behavior purposely sheltered by our system of justice. Therefore, because plaintiff was unable to demonstrate that "there was an absence of probable cause for the proceeding," *Lind, supra,* 67 *N.J.* at 262, 337 *A.*2d 365, the trial court correctly determined that plaintiff's malicious prosecution claim must fail.

---

[10] We place no special significance on the fact that Wilcox, and not a police officer, signed the probable cause portion of the criminal complaint. Because the investigation in fact was performed by Wilcox, it was entirely proper that he signed the complaint. *See R.* 3:2–1(a) (providing that "[t]he clerk or deputy clerk, municipal court administrator or deputy court administrator shall accept for filing any complaint *made by any person*" (emphasis supplied)).

[11] *Rule* 3:2–1(b) mandates that, when, as here, "the complaint alleges an indictable offense, the complaint, and all available investigative reports, shall be forwarded to the prosecutor within 48 hours."

That conclusion also moots the need to address separately whether the prosecution of plaintiff was actuated by malice.

## IV.

The Appellate Division, however, also determined that plaintiff had pled a cause of action in negligence. *Brunson, supra,* 402 *N.J.Super.* at 446–53, 954 *A.*2d 550. We recently reaffirmed that, "[i]n order to sustain a common law cause of action in negligence, a plaintiff must prove four core elements: '(1) [a] duty of care, (2) [a] breach of [that] duty, (3) proximate cause, and (4) actual damages[.]' " *Polzo v. County of Essex,* 196 *N.J.* 569, 584, 960 *A.*2d 375 (2008) (quoting *Weinberg v. Dinger,* 106 *N.J.* 469, 484, 524 *A.*2d 366 (1987)). Although that proposition is of general application, in the unique context of whether a bank owes a duty to a non-customer, it is clear that "[a]bsent a special relationship, courts will typically bar claims of non-customers against banks." *City Check Cashing, Inc. v. Mfrs. Hanover Trust Co.,* 166 *N.J.* 49, 60, 764 *A.*2d 411 (2001). *Accord Pennsylvania Nat'l Turf Club, Inc. v. Bank of W. Jersey,* 158 *N.J.Super.* 196, 203, 385 *A.*2d 932 (App.Div.), *certif. denied,* 77 *N.J.* 506, 391 *A.*2d 520 (1978) ("In the absence of any agreement, undertaking or contact between plaintiff and defendant from which any special duty can be derived, the improper handling of [an] account cannot in the abstract serve as a stepping stone for liability to plaintiff.").

Acknowledging that "[t]he question of whether a bank has a duty of reasonable care to non-customers who have been victimized by imposters has not been addressed in New Jersey[,]" *Brunson, supra,* 402 *N.J.Super.* at 448, 954 *A.*2d 550, the Appellate Division relied on *Patrick v. Union State Bank,* 681 *So.*2d 1364 (Ala.1996), to "hold that Affinity and Wilcox may be held liable for initiating the criminal complaints against plaintiff based upon the negligent investigation of the fraud perpetrated on the bank by the imposter." *Brunson, supra,* 402 *N.J.Super.* at 452, 954 *A.*2d 550. We do not agree.

*Patrick* stands for the proposition that, in an identity theft case, a bank will be deemed to have a relationship with the identity theft victim, even though that "relationship" is based on fraud. According to *Patrick, supra,* that is so because the "bank undeniably thought that it had a relationship with" the plaintiff. 681 *So.*2d at 1369. It explains that because the bank "opened a checking account under the [plaintiff's full] name . . ., under [the plaintiff]'s Social Security number, and based solely upon the presentation of [the plaintiff]'s temporary driver's license as identification, persuades us that there is some relationship between the parties." *Ibid.* It noted that "[t]he fact that the relationship defies common categorization does not mean that there is no relationship." *Ibid.*

The expansive holding in *Patrick,* however, has met with near universal disapproval. Within its own state, *Patrick* has been distinguished, *Flying J Fish Farm v. Peoples Bank of Greensboro,* 12 *So.*3d 1185, 1194–95, 2008 *WL* 4687091 (Ala.2008) (limiting *Patrick's* holding to traditional tort element of whether harm was foreseeable); it has been criticized, *Smith v. AmSouth Bank, Inc.,* 892 *So.*2d 905, 911 (Ala.2004) (explaining that "our inquiry in *Patrick* was not properly focused"); and its value as precedent has been limited exclusively to a repetition of the elements of a common law tort, *see, e.g., DiBiasi v. Joe Wheeler Elec. Mbrshp. Corp.,* 988 *So.*2d 454, 461 (Ala.2008) (requirement of foreseeable harm); *Pritchett v. ICN Med. Alliance, Inc.,* 938 *So.*2d 933, 937 (Ala.2006) (same); *Zanaty Realty, Inc. v. Williams,* 935 *So.*2d 1163, 1167 (Ala.2005) (requirement of existence of duty); *Taylor v. Smith,* 892 *So.*2d 887, 892 (Ala.2004) (requirement of foreseeable harm); *Dickinson v. Land Developers Constr. Co.,* 882 *So.*2d 291, 302 (Ala.2003) (requirement of existence of duty); *Akpan v. Farmers Ins. Exch., Inc.,* 961 *So.*2d 865, 873 (Ala.Civ.App.2007) (requirement of existence of duty); *Key v. Compass Bank, Inc.,* 826 *So.*2d 159, 170 (Ala.Civ.App.2001) (requirement of foreseeable harm); *Rutledge v. Arrow Aluminum Indus., Inc.,* 733 *So.*2d 412, 416 (Ala.Civ.App.1998) (requirements of existence of duty and foreseeable harm).

In other jurisdictions, *Patrick* has fared far worse. Federal courts either have rejected or limited *Patrick's* import. *See Greer v. Honda Mfg. of Ala., LLC,* 280 *Fed.Appx.* 808, 813 (11th Cir. 2008) (limiting *Patrick* to question of foreseeable harm); *Eisenberg v. Wachovia Bank, N.A.,* 301 *F.*3d 220, 226 (4th Cir.2002) (citing *Patrick* only as supporting proposition contrary to main proposition). Courts in other states have been equally reticent to embrace *Patrick's* reach. *See TD Ameritrade, Inc. v. McLaughlin,* 953 *A.*2d 726, 738 (Del.Ch.2008) (describing *Patrick* simply as "authority to the contrary"); *Guerra v. Regions Bank,* 188 *S.W.*3d 744, 748 (Tex.App.2006) (declining to follow Patrick); *Zabka v. Bank of Am. Corp.,* 131 *Wash.App.* 167, 127 *P.*3d 722, 725 (2005) (explaining that *"Patrick* had a unique set of facts and at least one subsequent Alabama case, far more similar to this case than *Patrick* was, limited its application"); *Nicholl v. NationsBank of Ga., N.A.,* 227 Ga.App. 287, 488 *S.E.*2d 751, 753 (1997) (limiting *Patrick* to instances "[i]n which the plaintiff presented testimony from a bank security expert regarding identification requirements that were reasonable and common in the banking industry, and the evidence established the account in the plaintiff's name was opened with identification that did not meet such requirements").[12]

We are not persuaded that *Patrick's* rule should be adopted in New Jersey. In our common law jurisprudence, we place great stock on whether a party owes a duty to another before any

---

[12] Our research reveals no published decision and but one unpublished case that follows *Patrick* without qualification. In *Torres v. Valencia,* 2006 *WL* 3779815, 2006 *U.S. Dist. LEXIS* 94602 (W.D.Tex. Sept. 27, 2006), a federal court adjudicating state law claims held a bank liable for an imposter account. Yet, *Torres* was decided seven months after the Texas Court of Appeals decided *Guerra,* which expressly stated that it "decline[d] to follow Patrick." *Guerra, supra,* 188 *S.W.*3d at 748. In light of the fact that a state appellate court had determined what that state's law was, the failure of a federal court addressing state law claims to even acknowledge that *Guerra* had been decided lessens *Torres's* import. Additionally, *Torres* is an unpublished decision and, under our *Rules,* "[n]o unpublished opinion shall constitute precedent or be binding upon any court." *R.* 1:36–3.

considerations of liability may flow. As noted in *Hopkins v. Fox & Lazo Realtors,*

> [w]hether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.
>
> [132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993) (citations omitted).]

In this context, those considerations must be tempered by the competing policy concerns that inform malicious prosecution actions, that is, that "malicious prosecution is not a favored cause of action because citizens should not be inhibited in instituting prosecution of those reasonably suspected of crime." *Lind, supra,* 67 *N.J.* at 262, 337 *A.*2d 365. That process requires that we analyze the conflicting concerns that arise from allowing an action for negligent investigation to go forward when a malicious prosecution action is barred. Those concerns must be gauged against our reluctance to impose a duty of care on banks in respect of a total stranger. On balance, we are led to conclude that the Appellate Division erred when it imported a claim based on an alleged negligence that otherwise cannot meet the requirements for a malicious prosecution action. In a poignant respect, Affinity and Wilcox correctly describe the Appellate Division's reasoning: in effect, the panel created a "negligence back door" that avoids the intentionally difficult requirements for a malicious prosecution claim and, thereby, renders those requirements irrelevant. We are unwilling to follow the Appellate Division's lead, and thus reject the panel's creation of a new cause of action for negligent investigation as a surrogate for a traditional malicious prosecution claim.[13]

---

[13] That said, nothing in this opinion should be read to foreclose forever a claim that, in appropriate circumstances, a bank may have a duty of care to an

## V.

Although our disposition of this appeal foregoes a trial, both the trial court and the Appellate Division discussed, albeit almost in passing, plaintiff's obligation to appear at trial. Because the resolution of that question as adopted by either the trial court and the Appellate Division was incomplete, we add the following in respect of plaintiff's failure to appear.

Plaintiff presently is serving a twelve-year term of incarceration at a federal prison in Oklahoma. As permitted by our *Rules of Court*, *R.* 1:9–1, Affinity and Wilcox issued a notice in lieu of subpoena commanding plaintiff's appearance at trial. Plaintiff's counsel responded that the case would proceed without plaintiff's presence as, in counsel's view, plaintiff need not be present to present his affirmative case-in-chief.

The trial court noted that Affinity and Wilcox had "served a Notice in Lieu of Subpoena for [plaintiff, a] critical witness." It explained that plaintiff "is critical to [Affinity's and Wilcox's] defense insofar as the [p]laintiff is suing for ... emotional damages and that cannot be assessed without the direct testimony of the [p]laintiff in the matter and [Affinity and Wilcox] would be seriously hampered [without it]." It further observed that "[t]here has been no showing in the paperwork as to efforts made [to produce plaintiff at trial]." It explained that, on plaintiff's counsel's part, "there has been no attempt whatsoever to obtain the [p]laintiff for this trial[.]" For that reason, the trial court ruled that "the failure to produce the [p]laintiff or even showing that they tried and could not do so is a ground[ ] for the dismissal of the case[.]"

Staking out the opposite extreme, the Appellate Division summarily reversed the trial court's ruling. It noted that "[c]learly, the trial court erred [in] stating that plaintiff had to be present for trial." *Brunson, supra,* 402 *N.J.Super.* at 453, 954 *A.*2d 550.

---

innocent, unrelated third party harmed by the theft of his or her identity. Those circumstances, however, are not present here.

Instead, it ruled that, "[a]s long as the proofs can be presented in accordance with the rules of evidence, plaintiff need not be present for trial." *Ibid.*

The damages plaintiff alleged in the count of his complaint alleging malicious prosecution are limited to "extreme emotional distress," the expenditure of "fees for his defense," and the "depriv[ation] of his liberty" because he "was incarcerated for thirteen days." In respect of his negligence claims, plaintiff alleged that he "was caused great pain and suffering; he has been and was required to endure the humiliation and suffering of wrongful and false imprisonment." Other than plaintiff's claim for the fees he incurred in the defense of his criminal case, which are readily susceptible to proof without plaintiff, we share the trial court's well-founded doubts as to how plaintiff can prove his affirmative claims from afar, much less allow Affinity and Wilcox a fair opportunity to present a defense. Yet, we conclude that the remedies allowed by either the trial court—dismissal of the complaint—or the Appellate Division—forbearing plaintiff's appearance entirely—are too extreme.

It seems beyond dispute that, in order to support the overwhelming majority of his damages claims, plaintiff must testify before the fact finder; otherwise, plaintiff's claims of emotional distress and pain and suffering would be subject to sheer conjecture. Those concerns are resolved by resort to our *Rules of Court,* which are to be "construed to secure a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." *R.* 1:1–2. *See Romagnola v. Gillespie, Inc.,* 194 *N.J.* 596, 604, 947 *A.*2d 646 (2008) (explaining that "'the relaxation provision [of Rule 1:1–2] should be sparingly resorted to, particularly when a reasonable interpretation of the complex of directly applicable rules meets the problem at hand'" (quoting Pressler, *Current N.J. Court Rules,* cmt. 2 to *Rule* 1:1–2 (2007))).

There are reasoned, intermediate steps between the outright dismissal of the complaint and allowing plaintiff's claims to go

forward in his absence that should have been explored. For example, the rules governing pre-trial depositions could have been invoked to take plaintiff's deposition *de bene esse,* that is, "in anticipation of a future need[.]" *Black's Law Dictionary* 408 (7th ed. 1999). *See Graham v. Gielchinsky,* 126 *N.J.* 361, 371, 599 *A.*2d 149 (1991) (defining *de bene esse* deposition as "one that is taken provisionally for use if the witness is unavailable at the time of trial"). Even outside the confines of a pending case, procedures exist to preserve testimony when needed. *See R.* 4:11–3 (providing that *Rules* "do not limit the court's power to entertain an action to perpetuate testimony or to enter an order in any pending action for the taking of a deposition to perpetuate testimony"). Of course, in the circumstances presented, the apportionment of costs required to pursue alternate processes remains vested in the trial court's sound discretion. *See R.* 4:14–1 ("The deposition of a person confined in prison may be taken only by leave of court on such terms as the court prescribes.").

The *Rules* provide for reasonable alternatives that should be explored when a party is unable or unwilling to participate in those steps integral to a fair trial. That said, parties and the trial courts should bear in mind that "[w]hen a plaintiff fails to honor a notice in lieu of subpoena, he subjects himself to the list of sanctions referenced in *Rule* 1:2–4(a), one of which is dismissal of the complaint." *Gonzalez v. Safe & Sound Sec. Corp.,* 185 *N.J.* 100, 115, 881 *A.*2d 719 (2005) (internal quotation marks omitted). Further,

[a] plaintiff cannot invoke the jurisdiction and machinery of our civil justice system, openly defy the court's authority to suit his own purposes, and expect to triumph. A plaintiff does not get to present to the jury his evidence while suppressing another party's evidence, or to pick and choose the rules he intends to follow. The defendant, as much as the plaintiff, has a right to his day in court. Because one of the essential purposes of a civil trial is the search for truth, the one who initiates that process by filing a complaint cannot be permitted to obstruct that search when it becomes unpleasant or inconvenient.

The trial court, not the parties, bears the ultimate responsibility for ensuring the fairness of the proceedings. The court is armed with coercive powers to achieve that end. . . . A plaintiff who refuses to testify in the face of a court order must be told that if he persists in his refusal, his case will be dismissed with prejudice.

[*Id.* at 117–18, 881 *A.*2d 719.]

## VI.

The judgment of the Appellate Division reversing the trial court's entry of summary judgment in favor of Affinity and Wilcox is reversed; the judgment of the Appellate Division remanding the case to determine whether Affinity and Wilcox are liable to plaintiff in negligence is reversed; the judgment of the Appellate Division determining that plaintiff need not appear physically as a witness at trial in order for the trial to proceed is vacated; and the judgment of the trial court dismissing the complaint is reinstated.

For reversal in part/vacatment in part/reinstatement—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.